REID, Judge.
This is a suit for damages to sugar cane crops, land and farming equipment, brought *399 'by the owners and the tenant of two adjacent sugar cane farms in St. Mary Parish, seeking to recover damages from the defendant, Columbia Gulf Transmission Company, resulting from the laying and construction of a pipe line by the defendant across the plaintiffs’ properties in December, 1959 and January, 1960.
The record shows one of the plaintiffs, Luke Landry, was the tenant on two farms, one belonging to Robert J. Landry, (which shall be referred to as the Robert J. Landry Farm), and the other belonging to the Estate of Maggie D. Landry, (which shall be referred to as the Maggie D. Landry Farm.) A coulee or large drainage ditch running north and south separates these two farms. The Maggie D. Landry Farm is on the east side of the ditch and the Robert J. Landry Farm is on the west side.
Luke Landry was not only a tenant on both farms but was also part owner of the Maggie D. Landry Farm. The other plaintiffs were' the remaining owners of the Maggie D. Landry Farm. Robert J. Landry did not join in these proceedings. Under the agreement between the tenant and the owners, the tenant had the sole responsibility of cultivating and harvesting the cane. Thus, all elements of damage in that respect belong exclusively to the tenant, while the damage in the destruction of sugar cane crops belong four-fifths (■%) to the tenant and one-fifth (%) to the owners. The plaintiffs in this suit are suing not only for the cane destroyed in the actual construction area but for the loss of their entire remaining crop in Squares 35, 43, and 44 on the Maggie D. Landry Farm and Square No. 3 on the Robert J. Landry Farm, together with a claim for an eight per cent loss of the crop in Square No. 4 in the Robert J. Landry Farm which the plaintiffs attempted unsuccessfully to cultivate. The plaintiffs predicate their claim for the loss of their crops to the negligence of the defendant in constructing the said pipe line, in failing to properly cleanup the area, reopen the drains which were blocked by the construction work, and drainage systems were destroyed causing excessive water to remain in the ditches, thus, flooding the field. Said inundation not only damaged the plant and stubble cane remaining in the field but rendered the whole area impassable for farm implements necessary to continue the cultivation of the remaining cane in the said cuts, thus forcing the plaintiffs to abandon their' 1960 crop in the above mentioned squares or cuts. It should be pointed out that at the time of the construction of the pipe line the plaintiffs had completed the harvest of the 1959 crop on the properties involved and it was the 1960 crop which the plaintiffs were forced to abandon.
The damage to which the plaintiffs maintain they are entitled, is based upon that set forth in two similar damage agreements, for each of the farms, entered into between plaintiff, Luke Landry, as tenant, and the defendant. The right-of-way agreement read as follows:
“The purpose of this Letter Agreement is to set out the agreed basis of payment by the Company for construction damages to you (and/or Tenants’) sugar cane. We hereby agree to pay for construction damages to sugar cane, after construction of the pipeline and appurtenances thereto on this property, on the basis of $9.00 per ton of cane lost, destroyed or damaged both on and off the right of way as a result of or from such construction. The total tonnage per acre of all cane lost, destroyed or damaged by such construction shall be computed as follows:
90 tons per acre, if plant cane
60 tons per acre, if first year stubble
30 tons per acre, if second year stubble
“All damages to sugar • cane shall be paid Ys to the owner and j/$ to the tenant (reserving the right for you to claim other damages if same should occur).
*400 “It is understood that by the acceptance hereof, you agree to use all reasonable efforts to minimize and mitigate the crop damages arising out of such construction.”
The plaintiffs maintain that this agreement applies to the damage of cane whether located on or off the right-of-way and whether caused directly by the actual construction work, or, as in the case at issue, indirectly by damage which caused the plaintiffs to abandon their fields. The defendant, on the other hand, contend the damage agreement applies only to cane actually damaged by construction, whether on or off the pipe line, and not to cane damaged in any other area which may have been incidentally damaged as the result of the interference of the drainage system.
In addition to damages claimed by plaintiffs for loss of the cane crop plaintiffs also claim various damages for expenses incurred in attempting to repair the field, drainage, control of weeds and for leveling the land together with a claim for damage to certain farm equipment.
The defendant admitted liability for the loss of the cane located within the construction area. At the trial the Company maintained the cane on Square 44 of the Maggie D. Landry Farm was second year stubble rather than first year stubble. However, it abandoned this claim on this appeal.
After trial the Judge rendered judgment in favor of the plaintiffs on all issues as follows :
“$40.00 for repair of field rows,
$90.00 for repair of drainage,
$128.70 for Johnson grass control,
$168.30 for work and fertilizer on the pipe line area,
$50.50 for damage to a plow,
$430.80 for land leveling,
$24.00 for removing embedded timbers,
$1388.88 for four-fifths share of crop destroyed in Square 3, of Robert J. Landry Farm at 30 tons per acre, and $9.00 per ton, said square containing 6.43 acres,
$1036.80 for four-fifths share of crop damage to extent of 80% in Square 4, containing 3 acres of the same farm at 60 tons per acre and $9.00 per ton,
$3697.49 for four-fifths net share of cane damaged on the Maggie D. Landry Farm, composed of 2.7 acres in Square 35 at 90 tons per acre (194.4 tons) and 5.23 acres in Squares 43 and 44 at 60 tons per acre (251.04) or a total of 445.44 tons, at $9.00 per ton, after deducting $311.47, which is the four-fifths portion of the credit due the defendant for 43.26 tons of cane saved at $9.00 per ton.”
“Let there be further judgment in favor of the plaintiffs in the respective proportions alleged in their petition, and against the defendant in the sum of $924.37 for the one-fifth net share of cane damaged in Square 35 (2.7 acres) at 90 tons per acre (48.6 tons), and $9.00 per ton, or $437.40, and for the one-fifth net share of cane damaged in Squares 43 and 44, containing 5.23 acres at 60 tons per acre, or 62.76 tons, at $9.00 per ton, amounting to $564.84, after deducting $77.87, which is the one-fifth portion of the credit due the defendant for 43.26 tons of cane saved, at $9.00 per ton.”
In connection with this appeal taken from the above described judgment the defendant makes no complaint as to the first seven items but contests the balance of the judgment which awarded plaintiffs virtually the entire amount of their claim for damages for growing crops. The defendant concedes a portion of the award for the damage to the growing crop is due by it, namely $1395.90 but contends the additional award of $5651.64 is unjustified, accordingly this appeal.
The sole issue on appeal is whether the plaintiffs were entitled to the award of dam *401 ages by the Trial Court for the loss of their cane crop off the actual construction area. This issue has two parts: First, factual, whether the defendants actually blocked the drains to such a degree plaintiffs’ fields were flooded, thus causing the crop to be abandoned because of water damage and because the fields were in such condition the tenant could not cultivate them, thus forcing him to abandon his crop on the area in question, or, second, as the defendant contends the cane crop was lost because the tenant abandoned it without attempting to cultivate and harvest it as he could have done and that his abandonment was not the result of any action by the defendant in blocking the drainage system or in causing flooding of the fields. The second issue deals with the measure of damages which the Trial Court awarded the plaintiffs for damage to that portion of the crop which was outside of the construction area. The Trial Judge held that the measure of damages set for in the above quoted damage agreement applied to all of the cane lost, regardless of whether or not it had been destroyed in the construction area or abandoned. The defendant contends that the measure of damage set forth in the damage agreement applied only to the cane damaged in the area wherein construction occurred and did not apply to damages to cane in any other area outside of the construction area wherein cane might have incidentally been damaged as a result of the interference with the drainage.
In his well written reasons for judgment the Trial Judge discussed in detail every point which is at issue herein. In regard to the question of whether or not the defendant did or did not block the plaintiffs’ drain, the Trial Judge concluded, on the basis of photographs presented by the plaintiff and on the testimony of witnesses, the defendant did block the drains and stated:
“Of course, the photographs presented by the plaintiff are mute annd convincing evidence that it did. The Exhibits P-14, P-15, P-16, P-19, P-21, P-22, and P-25 show stopped-up ditches with water in them. The Exhibits P-17, P-20, P-23, and P-24 show water in the rows of cane and in the field. The Exhibits P-18 and P-25 show the condition of the land in the right-of-way after the construction of the pipeline. These exhibits show by photography what the witnesses described.
“Furthermore, it is obvious that a trench cannot be dug and filled across a cane field without the creation of a hump by the fill and the depositing of dirt in all of the ditches crossed by the fill. The hump effectively prevents the natural flow of drainage water across it. Although this is unavoidable, it is not irremedial. The defendant did not take the proper steps to remedy the condition. It did not remove the dirt from the drains and it did not satisfactorily retrace the drains across the hump. In doing its work the defendant broke, or caved in, some bridges over ditches. It did not repair them. Some of plaintiffs’ witnesses testified that the work of restoring the right-of-way across these fields was the sloppiest they had ever seen. In fact, many heavy timbers were left embedded in the ground causing damage to cultivation equipment.
“It is evident that defendant’s contention that it did not stop up the drains is not supported by the evidence. Only a small amount of dirt deposited in the drains of a cane field will impair drainage because these drains do not have much slant.”
The Trial Judge further held the blocking of the drain by the defendant definitely caused a flooding of the plaintiffs’ field and crops. He reasoned that as these pictures were taken on April 6, four days after the last rain, if the drainage had been sufficient water would not have been standing in the cane .rows and in the ditches.
In regard to the question of whether the crop was abandoned for reasons other than *402 water damage and because of the inability of the plaintiff to cultivate his fields, the Trial Judge said:
“The next defense is that the cane was lost because the crop was abandoned and not because of water damage. An examination of the aerial photograph D-l tends to support that contention, at least, to one not conversant with sugar cane farming. This is so because only two cuts, or squares, of cane were actually crossed all the way by the pipeline. They are cuts 35 and 44. Only a small portion of the others lay in the right-of-way. Only a small corner of cuts 4, 36 and 43 was traversed, and, in cut 3 a large area was not touched by the pipeline. It would appear that all of the undisturbed areas could have been cultivated.
“That is probably true. It was physically possible to run cultivating machinery into the undamaged rows and cultivate the cane, even though this machinery is required to negotiate the whole row after it has entered it, as it cannot turn around before it gets to the other end. But the cultivation of sugar cane is expensive. It is not profitable to cultivate a damaged or poor crop. A farmer can suffer a great financial loss in doing so.
“And, sugar cane is one crop that is not water tolerant. Stagnant surface water over the roots of sugar cane is very damaging. A prudent farmer will not venture the cost of cultivating cane where rain will leave water standing in the rows, for he does not know when a heavy rain will come and kill his whole crop.
“It is evident, therefore, that proper drainage is essential to successful sugar cane farming. The drainage system employed by the plaintiffs is substantially the same used by most farmers. This consists of quarter-drains, that is, small ditches that run across the rows near each end of the rows, and lateral drains. Lateral drains are the ditches into which the quarter-drains flow. They must carry the water into some main drain. That is usually a large ditch, coulee, or bayou. Such a system must be employed because the rows themselves cannot be used as ditches; they are stopped up on each end by a turn row. Turn rows are essential for the maneuvering of the farming machinery. If a ditch were there instead, so that the rows could drain into it, the rows would not be accessible to the machinery. Quarter-drains are therefore necessary.
“Not only that, but it is obvious that such a system depends heavily upon the level of the soil. It is not possible to give much slant to small ditches like quarter and lateral drains. Yet, they must flow in the right direction, or they will not carry away the water. The level of the soil is therefore very important. Any obstruction anywhere in the system, such as dirt left in a ditch, o,r a hump across it, paralyzes the system.
“Another reason why not much slant can be given these drains is because sugar cane needs considerable moisture to grow. The moisture is permitted to seep into the soil by preventing rain water from escaping too rapidly. The slope therefore must be gentle and gradual. If the slopes are too great, a cane crop may be lost in a dry year.
“At the time the drains are constructed, therefore, a farmer must protect himself against too much, or too little, rain by efficiently leveling his land.
“Thus, the lateral drain that drains cuts 3 and 4 is shown in the Exhibit D-l as the black line between cuts. This drain must flow into the large canal, or coulee, running horizontally across the photograph. But, it was crossed by the right-of-way, and apparently stopped up, a short distance before it enters the main drain. Simi *403 larly, the lateral that drains the cuts 35, 36, 43 and 44 is shown as the thin black line that runs between these cuts. It was crossed by the pipeline about midway. When these drains were stopped up, they could not carry away the water fed into them by the quarter-drains. The whole system filled up and water stayed in the rows. That is why cane was damaged far away from the pipeline area. All of the area dependent upon this drainage system was affected.
“The pipeline was constructed during the months of December, 1959 and January, I960. That period was followed by much rain. On several occasions water remained in the rows for several days. The witnesses all agree that that spring was a wet season. The tenant, Luke C. Landry, concluded that his cane was damaged, but least in cut number 4. He cultivated it in accordance with accepted methods and its yield was less than 50% of normal. He lost money and proved that his deductions were correct.
“Defendant’s contention that plaintiff’s crops did not suffer any damage from water is therefore untenable.
“Defendant’s next contention, that the cane was lost because they were abandoned, is also not supported by the evidence. The plaintiffs produced Mr. Roland Hebert, a successful and reputable cane farmer, who testified that, in his opinion, it would not have been profitable to cultivate and harvest the crops in question because water had remained in the rows so long that it had damaged the roots of the cane. The County Agent testified that the construction had disrupted drainage and the land level. On his visit of April 5, 1960 the land was too soft to cultivate.
“The defendant produced Mr. W. E. Peltier, a farmer of long and varied experience in the cultivation of sugar cane. Mr. Peltier’s opinion was to the contrary. He based his judgment on his observations made on a visit to the property on June 21, 1960. On that day colored photographs of the right-of-way and the crops were taken. They are in evidence as Exhibits D-2 through D-ll.
“Mr. Peltier contradicted the plaintiff, Luke Landry, on practically every point. He said the drains were opened and the land seemed to be dry and well drained. The right-of-way was level and one could drive over it in a car. The cane had a good stand, except in cuts 3 and 4, and in those cuts the poor stand was not due to poor drainage, but to Johnson grass infestation and being second or third-year stubble. The Johnson grass, he said, was there before the construction. He ascertained this by pulling some of it out. He testified that the roots come up with young plants, but break off with old ones. These broke off, he said.
“The color photographs were presented to corroborate Mr. Peltier’s observations and conclusions. There is some dispute whether they do, or do not.
“They appear to show a level and smooth right-of-way and a good stand of cane, with no water, or mud, on the property. Plowever, the plaintiffs contend that the photographs are deceiving because the grass on the right-of-way conceals its surface, and although the cane are shown to be green, actually they were yellow, a sign of damage.
“We would not be finding in accordance with the weight of the evidence if we would accept Mr. Peltier’s contention and reject that of the plaintiffs. Mr. Peltier made one visit to the property and his testimony is based on the deductions he reached from his observations on that day. His testimony is therefore based largely on theories and conclusions.
*404 "But aside from that, the most convincing proof that it would not have •been profitable to cultivate these crops is the fact that Luke Landry did cultivate one cut, cut number 4, and lost money on it.
“Contrary to what M.r. Peltier said, Landry testified that he had a good stand of cane in that cut and they ■seemed to have been least affected by the water. It has only a small portion of its area in the right-of-way. He worked it according to accepted practices and fertilized it sufficiently, yet his yield was only about 10 tons per acre. That is less than one-half of the normal yield.
“From this experience it is evident that the plaintiffs were justified in abandoning their crops.”
In answer to the defendant’s argument that the plaintiffs suffered no recoverable •damage for the cane outside of the right-of-way because the cane was not damaged, and in the alternative that if it were damaged the plaintiffs were barred from recovering because they could have opened the drains and cultivated the cane, the Trial Judge held as follows:
“To support that contention it depends mostly on the testimony of Mr. Peltier, its witness.
“Mr. Peltier did testify that he did not see any water damage to the cane and that the drains were in good condition on his visit of June 21, 1960.
“That is contrary to the testimony of Mr. Luke Landry and his witnesses, Mr. Roland Hebert and Mr. Minus J. Granger, the County Agent. The latter two visited the property on April 5, 1960.
“That the cane was damaged is ■shown by the poor yield in square number 4. Mr. Peltier claims that the poor yield is the result of a poor stand. But he is the only witness who so testified. It is difficult to conclude that Mr. Luke Landry would have gone to the trouble and expense of cultivating his poorest cane. To do so would be to impute to him the ulterior motive of manufacturing evidence to assist him in recovering in this action. Mr. Landry does not appear to be that kind of citizen.
“The answer to defendant’s alternative claim that the plaintiffs should have cleaned their drains and cultivated their crops so as to minimize their damage is that the evidence shows that the cleaning of the drains was an undertaking that was beyond the means of the tenant, Luke Landry. He did not have the manpower, the machinery nor the financial means of doing this work in time to cultivate the crops for whose loss this action is brought.
“The contention that the tenant should have cultivated and saved the cane in order to lessen the damages, of course, assumes that the undertaking would have been profitable. The evidence does not show that it would have been.
“If the proceeds of the cane would have been less than the cost of cultivating and saving it, the loss would have been the tenant’s.
“His agreement with the defendant, and the law of this State, compelling him to minimize damages, do not compel him to take this risk.
“There is, therefore, no merit to the contention.”
The Trial Judge in his reasons for judgment evidenced a keen awareness of the problems involved in sugar cane farming, and while there is conflicting evidence and conflicting testimony, they are not of such a nature as to lead this Court to take any other position than that of the Trial Court.
Thus, concluding that insofar as the factual question is concerned the Trial Judge is correct, an examination of the *405 measures of damages awarded should now be considered.
As already mention, the question of the measure of damages centers around the interpretation of the damage agreement quoted above, that is, was the measure of damages set forth in that agreement meant to apply only to the cane damaged in the area wherein construction occurred (and not to damage to cane in other areas outside the construction area resulting not from actual construction work but indirectly from interference with the drainage as contended by the defendant), or whether the rates set forth in the agreement applied to all of the cane lost regardless of whether or not it was destroyed in the construction area or by the forcing of the plaintiff to abandon his crop, as is the case herein. Again, the Trial Judge in his reasons for judgment very ably discussed this point and concluded:
“The defendant’s next contention is that the plaintiffs are entitled to recover only their actual damages, and not in accordance with the rates agreed to in the right-of-way transaction, for all of the cane lost out of the right-of-way area. It claims that this agreement affects the cane lost only in the area where it worked. The agreement is in writing and is in evidence as Exhibits P-S and P-6. It provides that plant cane shall be paid for at the rate of $9.00 per ton and 90 tons per acre; first year stubble at 60 tons, and second year stubble at 30 tons per acre.
“The pertinent part of the agreement provides as follows:
“ ‘We hereby agree to pay for construction damages to sugar cane, after construction of the pipeline and appurtenances thereto on this property, on the basis of $9.00 per ton of cane lost, destroyed or damaged both on and off the right-of-way as a result of or from such construction.’ ”
“Undoubtedly, this provision fixes the price of cane lost, destroyed or damaged, anywhere on the property at $9.00 per ton.
“In the same paragraph, and immediately following this provision, the agreement continues:
“ ‘The total tonnage per acre of all cane lost, destroyed or damaged by such construction shall be computed as follows: ’ ”
“The provision for the 90, 60 and 30 tons per acre mentioned then follows.
“It is likewise clear that this provision, being a continuation of the first and an addition thereto, also applies to all of the cane lost, destroyed or damaged, whether in the construction area, or not.
“If it had been the intention of the parties that all of the cane lost or destroyed, anywhere on the property, would be valued at $9.00 per ton, but only the cane in the right-of-way would . he computed at the designated tonnage per acre, then they would not have employed the word “all” in the latter provision. They would have restricted its application to the cane growing in the right-of-way, or construction area. The agreement contains no such provision or restriction. It clearly provides that “all” of the cane lost, destroyed, or damaged shall be computed at so many tons per acre, depending on whether it is plant cane, first, or second-year stubble.
“There is, therefore, no merit in this contention.”
 An examination of the right-of-way agreement clearly substantiates the Trial Judge’s opinion. The agreement makes no requirement that the damages result only from actual construction as contended by the defendant, but states that the company agrees to pay on the basis of *406 $9.00 per ton for cane lost, destroyed or damaged both on and off the right-of-way as a result of/or from such construction. It should be emphasized the agreement states this should be paid “as a result of or from such construction.” It is therefore clear that the agreement applied to damage to the cane no matter how damaged by the construction of the pipeline. We further observe that the agreement in question was prepared by the defendant. Apparently it is a standard agreement and the defendant had within its power the control of the language used therein. If the defendant desired that the agreement should not apply to a situation such as the case at issue, it should have so stated in the agreement. Even if it should be assumed that there is some doubt as to the interpretation of the agreement in the instant case, which fact is not shown by an examination of the agreement, this doubt would have to be resolved against the defendant who prepared the agreement. See Ernest A. Carrere’s Sons v. Rumore, La.App., 52 So.2d 57, wherein the Court held:
“Secondly, the document was prepared by the plaintiffs themselves. Where there is a dispute over what its provisions are, or what its stipulations mean, a document must be interpreted against those who have prepared it. Here, not only did plaintiffs prepare it, but it was on one of their printed forms.”
See also Succession of Cormier, La.App., 80 So.2d 571:
“But the interpretation of the clause in question urged by the Administrator is equally reasonable, to the effect that the words of a contract must be interpreted according to the intent of the parties, Article 1945, C.C., and if ambiguous, must be construed against him who has prepared the contract, Article 1957, LSA-C.C.”
It is, therefore, the opinion of this Court and we are in accord with the interpretation placed on the agreement by the Trial Judge.
For the reasons hereinabove set forth the judgment of the Trial Court is affirmed at appellant’s costs.
Affirmed.