225 So.2d 76 (1969)
MICHIGAN WISCONSIN PIPE LINE COMPANY, Plaintiff-Appellee,
v.
Douglas Joseph WALET et al., Defendants-Appellants.
No. 2724.
Court of Appeal of Louisiana, Third Circuit.
June 12, 1969.
Rehearing Denied July 24, 1969.
Dissenting Opinion July 25, 1969.
*77 Mestayer & Simon, by Ray F. Mestayer, New Iberia, for defendants-appellants.
Shotwell, Brown & Sperry, by Burt Sperry, Monroe, Earl H. Willis, St. Martinville, for plaintiff-appellee.
Before SAVOY, CULPEPPER and MILLER, JJ.
MILLER, Judge.
Six expropriation cases were filed by Michigan Wisconsin Pipe Line Company to obtain servitudes across defendants' property for the installation and operation of a natural gas pipeline within Iberia Parish, Louisiana. The cases were consolidated both for trial and appeal purposes. All issues presented in all six cases are discussed in this opinion, but a separate decision is being rendered in each case.
Plaintiff is a natural gas company within the meaning of the Natural Gas Act, U.S. C.A. Title 15, Section 717(a) and (b), and is the holder of a Certificate of Public Convenience and Necessity from the Federal Power Commission authorizing the construction of the 30-inch transmission pipeline and, as such, is entitled to institute these proceedings.
Landowners filed exceptions of prematurity and non-joinder and answers challenging the taking and the feasibility of the route. In the non-joinder exception, landowners contended that their property was under lease to tenants who had growing crops on the property and that these tenants should be made parties to the suit. With the exception of defendant Louis Dugas, Landowners failed to serve plaintiff with their respective answers and pleadings within ten days from the date each was served with the original pleadings, and *78 therefore they lost their right to challenge the taking and the feasibility of the route. LSA-R.S. 19:6 and 7. In the Dugas case, his answer was timely served and these issues were raised.
Prior to the date that exceptions of non-joinder were to be heard, the parties stipulated that the named tenants "are hereby made and recognized as party defendants in each of said suits, to the same extent and with the same effect as if they had been named defendants by plaintiff originally, and been served with the required notice, and had appeared and responded, jointly through same counsel with the landowner defendants. The parties further stipulate and agree that it shall not be necessary for said tenant-defendants to file any pleadings herein, but the said tenant-defendants shall be considered as having joined in and jointly filed every appearance, answer, exception, motion, exhibit or other document or pleading heretofore filed by the landowner defendant in the appropriate case * * *" (Volume 1, Walet case, Tr. 34).
On July 15, 1968 all exceptions, motions and objections previously filed were tried. The trial judge assigned written reasons on July 17th, holding essentially that, except in the Louis Dugas suit, all defendants failed to serve pleadings on counsel for plaintiff within the 10-day period set by LSA-R.S. 19:6 and 7, and therefore the only issue remaining, except in the Dugas suit, was that of adequate compensation. The trial court also held that tenants did not have a right to question plaintiff's right to expropriate or to challenge the feasibility of the route. All defendants applied for writs of certiorari, prohibition and mandamus to the Court of Appeal, Third Circuit, (Docket Number 2511) to have these rulings reversed. This application for writs was denied for the reason that an adequate remedy was available on appeal.
At the conclusion of the trial of the consolidated cases, counsel for Louis Dugas was specifically asked to proceed with his special defenses. It was counsel's position that the July 17th ruling limited the issue to compensation, and therefore he would not present evidence on the special defenses raised in the Dugas suit.
However the July 17th ruling held that Louis Dugas had not lost his right to contest the necessity of the taking or feasibility of the route. (Walet, Tr. 53). Furthermore, the Minutes of Court for July 29, 1968 (Walet, Tr. 3) state that "These cases were consolidated for the purposes of trial, with separate judgments to be rendered, on the question of damages only; the other questions or issues raised in #27947 (Dugas) will be taken up on the day set for its trial."
The record supports the trial court's finding that plaintiff had the right to institute these proceedings and that the route and location of the line were selected in accordance with sound engineering principles.
Appellants allege that the trial court erred:
(1) In holding that the owners of predial leases have no right to "challenge the taking."
(2) In refusing to issue subpoenas for maps and information vital to the defense to these takings.
(3) In limiting the trial to the question of quantum and in refusing to allow the "tenants" the right to question "location."
(4) In holding that outside of the servitude the only compensable damages were those factors which reduced the value of the land.
(5) In failing to allow damages for the loss of crops which, while not in the actual right of way, could not be harvested because of the construction of the pipeline.
(6) In failing to allow adequate damages.
As to the first and third assignments of error, there is nothing in the record to sustain *79 appellants' position that some of the leases were recorded. But appellants contend that we are not here concerned with whether there were written, recorded leases, or whether the pipeline company had actual knowledge of the existence of the leases. This argument is based on the fact that the lessees were made parties to the suits by stipulations entered before the trial judge ruled that such lessees had no right to challenge the taking. Appellants cite the case of Columbia Gulf Transmission Company v. Hoyt, 1968, 252 La. 921, 215 So.2d 114, where the landowner had granted a servitude to the pipeline company. At the time the servitude was granted there was in existence a recorded surface lease in favor of Hoyt. When Hoyt prevented the pipeline from crossing, the company sought an injunction and restraining order to prohibit Hoyt from blocking construction. The injunction was denied and it was held that "a predial lease is property within the meaning of Article I, Section 2 of the Louisiana Constitution. As such, it must be accorded constitutional protection, requiring just compensation to the lessee before the lease rights are damaged. See State Through Sabine River Authority v. Phares, 245 La. 534, 159 So.2d 144, and State ex rel. Cotting v. Sommerville, 104 La. 74, 28 So. 977."
We distinguish the Hoyt case, for the record does not support that we are here dealing with recorded predial leases. Separate ownership arising from a lease can be asserted against third persons only when the lease is recorded. LSA-R.S. 9:2721, LSA-CC Arts. 2264, 2266. See Minter v. Union Cent. Life Ins. Co., 180 La. 38, 156 So. 167; Summers & Brannins v. Clark, 30 La.Ann. 436; Yiannopoulous, Civil Law of Property, Section 44, p. 135 (1966).
Appellants also cite Texas Eastern Transmission Corporation v. Bowman, 238 La. 399, 115 So.2d 797 (1959), where the case was remanded to the trial court to take and pass on evidence as to the feasibility of the route proposed by the pipeline and the value of the rights of way sought. But there the trial court had not allowed evidence on these issues.
We distinguish Bowman in that here plaintiff established its right to expropriate and that the right of way sought to be expropriated was feasible. The record is complete on the issue of damages. While it is true that the tenants were not permitted to offer evidence which would challenge the taking, appellant Dugas was given the opportunity to present such evidence in connection with the consolidated case against Louis Dugas. He did not do so.
Since these tenants were made parties to the suits by stipulation hereinabove quoted, we find that so far as we are here concerned, the tenants are in the same position as their landowner lessors.
For their second assignment of error, defendants contend that the trial judge erred in refusing to issue subpoenas for maps and information vital to the defense of these takings. The trial judge properly ruled that the subpoenas sought by defendants under the provisions of C.C.P. Article 1492 required a showing of "good cause" before a litigant was entitled to the remedies therein provided. The motion filed by Landowners failed to show good cause.
The fourth, fifth and sixth assignments of error question the adequacy of the trial court's award and will be discussed together. Plaintiff did not answer the appeal, and accordingly, we limit our consideration to the question of the increase of the award and damages claimed by appellants. State, Department of Highways v. Reuter, 175 So.2d 316 (La.App. 4th Cir., 1965).
No complaint has been made to the trial court's $600 per acre valuation of all of this sugar cane farmland. The trial judge allowed defendants compensation in the amount claimed by them for the permanent right of way plus the temporary working area. He also granted the amount claimed so that the entire "cut" crossed by the *80 pipeline could be land levelled once and intensively treated for weed control for a three year period. Additionally the trial judge allowed the amount claimed by defendants for loss of sugar cane and loss of work preparation for the new crop, but limited these awards to the 75-foot right of way. And the trial judge allowed severance damages to two property owners where their farm land fronted a black top highway, on the theory that the pipeline reduced the value of such frontage (as future homesites) for a distance of 85 feet on both sides of the right of way to a depth of 200 feet.
Landowner-appellants contend that they should have received severance damages to their farmland; that they should have an award for fertilizing all of the land in each "cut" crossed by the pipeline; that they should be paid for the loss of the 1968 and 1969 crops of sugar cane and/or work preparation throughout each entire "cut"; and that an award should be made for a 35% loss of yield for an additional five year period in the right of way.[1]
To consider appellants' contentions, we must review the evidence concerning the problems of cultivating and harvesting sugar cane. Sugar cane is a crop that must be cultivated over a period of approximately fourteen months. It is planted in August or early September and is not harvested until the end of October, or in November and December of the following year. After harvesting, the crop reappears for two successive seasons (stubble cane) and is harvested in each of the two following years. Good farming practice allows three harvests (plant, first year stubble and second year stubble). In the fourth year, the land is allowed to lie fallow, or is planted with peas or corn to enrich the soil for future plantings of cane.
The Iberia Parish sugar cane crop is harvested entirely by mechanical harvesters and cane loaders. The harvesters cost from $18,000 to $20,000 each, and the small farmers have no backup or standby equipment. Each of the tracts here involved are relatively small farms, averaging about 15 acres, and each "cut" is substantially smaller.
After the cane is gathered by the harvesters and piled, the cane is loaded with mechanical loaders into two wheel carts pulled alongside the rows by a tractor. All of this equipment moves on wheels rather than on tracks.
During the wet, cold winters the sugar cane crop remains dormant. Properly cultivated fields must be well drained. Poorly drained fields become saturated and remain waterlogged and the growing cane is damaged or ruined. As noted in the case of Landry v. Columbia Gulf Transmission Company, La.App. 1st Cir., 1962, 148 So.2d 398, 402 "A prudent farmer will not venture the cost of cultivating cane where rain will leave water standing in the rows, for he does not know when a heavy rain will come and kill his whole crop."
The rows on which the cane is planted run in the direction of the slope, parallel to the main drainage ditches. Each furrow between rows acts as a small ditch, connected to the lateral ditches by a quarter drain located at the lowest point in each field. Each farm will have a farm road from front to back with headlands at both ends of each field leading to this farm road.
A "headland" is a built-up, compacted strip which serves as a road for farm equipment, wide enough to allow the harvesting and loading equipment to turn at the end of the rows. The distances between headlands is usually 600 to 800 feet, and a "cut" is the field of cane between "headlands".
The trial judge's findings of fact will not be reversed on appeal unless manifestly *81 erroneous since he is in a better position than a reviewing court to determine the credibility of witnesses. Marcantel v. White Painting Company, La.App. 3rd Cir., 1965, 171 So.2d 748.
We agree that defendants failed to show severance damages suffered to the agricultural or pasture lands. The lands in question are all under cultivation. The presence of the line after the construction damages are repaired will not interfere with the landowners cultivation of sugar cane. Landowners failed to prove that the presence of the line would adversely affect the market value of this farm land.
The record supports the trial court's refusal to award damages to allow landowner and/or tenants to fertilize the entire "cut" of sugar cane. Defendants failed to prove that the fertility of the land outside the right of way would be affected. We find no merit in their argument that the releveling process will cause undesirable clay type soil to be spread over the entire "cut."
We find no error in the trial court's refusal to allow a 35% loss of yield for a five year period for the crops which should grow on the right of way itself. While we are much impressed with the testimony of defendants' experts and with the pictures showing growing crops on the very properties involved in this litigation after these properties were crossed by plaintiff's 20-inch pipeline in 1964, we find that the trial court's allowance of fertilizer for the affected area and his award for the total loss of three crops on the right of way will make up this deficiency. We are much impressed, as has been both counsel, with the knowledge of the trial judge on the subject before the court.
Defendants most substantial claim is based on the fact that the pipeline crosses the sugar cane lands across the crop rows. They contend that this makes it impossible for them to save the 1968 crop along any row crossed by the pipeline.
The trial judge denied this claim, stating that "* * * plaintiff has presented testimony to show that in reasonably dry seasons this cane can be harvested without difficulty and without exposing the harvesting machines to undue risk of damage." This was based in part on the testimony of Mr. Harold Aubry, who at the time of his retirement had 47 years experience in the production of sugar cane and the manufacture of sugar. His company cultivated 3600 acres of sugar cane on their own lands and had tenant operations on another 3600 acres. He testified that his company lands had been crossed by pipelines on many occasions and specifically by a 30-inch pipeline in the year 1967. So far as he knew his company had no trouble harvesting the "cuts" of cane where rows were crossed by the pipeline. On cross-examination, Mr. Aubry admitted that he did not supervise the crews in the field; that he does know that equipment bogs down on occasion; that his company owns backup or standby equipment which can replace equipment which might be damaged during the harvest; that his company will not undertake to custom harvest cane for other farmers; that because of the size of their operation they can schedule harvest operations such that fields where pipelines have crossed will be harvested during dry weather.
Other evidence supporting the trial court's finding was that of plaintiff's expert agronomist, Mr. David Black. He testified that he had made hundreds of investigations of cane lands through which pipelines have passed; that he conducted these investigations on behalf of the company for the purpose of determining damages to be paid to landowners; and that he has never seen a tract on which a farmer has had to abandon the cane on "cuts" crossed by the pipeline.
The trial court concluded that to award damages for the loss of the crop located out of the right of way, but on "cuts" which were crossed by the pipeline would be speculative; that "defendants bear the *82 burden of establishing their claim by competent evidence and to a legal certainty. (citations omitted) Obviously they have failed to do so. The principal support of their contention is bad weather. Weather conditions are always speculative, while our law requires that they prove their claim to a certainty."
The preponderance of the testimony was that normal weather during the harvest season was rainy weather. There can be no question but that defendants proved that they could expect difficulty in harvesting their 1968 crop standing on the "cuts" crossed by the pipeline.
Defendants' experts, Lloyd Lauden (an experienced agronomist employed by the sugar planters), Nelson Hanks (County Supervisor for the Farmers' Home Administration), and Dolan Klienpeter (USDA Soil Stabilization Service), each testified essentially that:
"My opinion would be that a prudent farmer following all the best recommended practices and judgment would not undertake harvesting small tracts shaped in a triangle shape as it is under the present circumstances of a pipeline going through." (Vol. 6, Walet case, Tr. 359.)
Two area farmers, Mr. Luto Braquet and Mr. Louis Suard, verified that prudence required that the cane be abandoned. Mr. J. O. Neuville testified that he custom cuts cane for farmers and that he would not cut across the pipeline for a price which the farmers could afford to pay; that the price would exceed the value of the cane.
All of the landowners and tenants testified without equivocation that they intend to abandon all cane growing within the entire "cut" of cane crossed by the pipeline, and that they know from personal experience that they cannot possibly harvest the cane outside the right of way; that they would not risk their own equipment, and could not lease equipment because the owners thereof will not assume the risk; that they are small producers, with limited means and equipment and that none own standby equipment or any equipment heavy enough to repair the construction damage caused by the pipeline before the 1968 harvesting season.
The trial court was impressed by the fact that these witnesses could name only two parties who had suffered such a loss. Furthermore, he was impressed by the fact that such losses, if they did materialize, could be collected as damages resulting from the construction. During the course of an evidentiary ruling (Vol. 6, Walet case, Tr. 373) the court stated: "Of course, it makes very much difference to the Court in assessing these damages to ascertain whether or not those who may claim them may or may not have further recourse. Apparently, from (defendant) counsel's argument, he wants the Court to assess the damages before they occur. That is very speculative. And we must resort to this type of proceeding only when it is the only method by which these damages can be assessed."
Although we are impressed with defendants' argument that it will probably require another lawsuit to collect damages for loss of their 1968 crop, we cannot find error in the above quoted reasoning of the trial court, and we affirm the denial of the alleged loss of the 1968 crop. But we reserve to plaintiffs their right to claim such damage.
We find that the trial court erred in failing to allow compensation for loss of the 1969 crop located within a "cut" crossed by the pipeline but out of the right of way. The trial judge allowed damages to restore the land level and to control weeds within the entire "cuts" affected by the pipeline, but did not allow compensation for the fact that these restorative procedures will kill the stubble cane and/or cause the loss of one crop year. The trial judge held that "Unless the level (of the land) is restored, proper drainage is not possible. And, to obtain a proper level, the whole cut must be re-worked." We have noted that unless *83 proper drainage is maintained, a prudent farmer will not incur the substantial expenses required to cultivate his crop of sugar cane.
Releveling the entire "cut" will cause the loss of the 1969 crop on each "cut" crossed by the pipeline. The record indicates that the pipeline was to be constructed in August or September, 1968. After this, landowners must allow some time so that the earth fill over the pipeline may settle in order that they will not waste their work by releveling too early. By this time, it will be too late to level and prepare the lands for even a late 1968 planting for the 1969 crop.
In awarding only one full year's crop on the entire cut we are aware that defendants have been otherwise damaged for the reason that they must reschedule all plantings on the involved "cuts" to make a new planting in 1969 so that they will have their first of the three crop year cycles in 1970.
To determine the amount lost by the landowners and tenants in these cases for the loss of their 1969 crop, we must consider that the landowner receives 20%[2] of the crop without bearing any expense relating to the planting, cultivating and/or harvesting of the crop, while the tenant receives 80% of the crop and bears all such expenses.
Since the landowners receive their share free of expenses, they are entitled to 20% of the value of the 1969 crop. The tenants will save the costs of cultivating and harvesting the crop, and are therefore entitled to the profit which they would have made on their share of the 1969 crop.
To determine the value of the 1969 crop to the landowner, we apply the $12 per ton price accepted by the trial court, and multiply this times 20% of the number of tons per acre raised on the farm for the year 1967. To determine the profit the tenants would have made on the 1969 crop we find the preponderance of the testimony to be that the farmers of small tracts make a profit of $3.00 per ton on their share (80%) of the cane harvested. Therefore we multiply $3.00 times 80% of the number of tons harvested per acre on each farm for the year 1967.
We note that Millard Eldridge farms his own property and, therefore, he is treated as landowner for 20% and as tenant for 80%. Landowner Louis Dugas is treated only as landowner, for his tenant was not a part to these proceedings.
In applying these rulings to each case, we find that we must increase the awards as follows:
To Douglas J. Walet et al from $3,313.35 to $5,460.87.
To Claude J. Gonsoulin et al from $3,187.57 to $5,233.81.
To Millard M. Eldridge from $5,171.10 to $6,938.46.
To Edwin A. Gonsoulin et al from $3,213.57 to $5,259.81.
To Lewis J. Oubre et al from $2,298.40 to $3,437.44.
To Louis J. Dugas et al from $3,055.50 to $6,992.70.
After the trial court rendered and signed the judgments, landowner-defendant Louis Dugas filed a "Motion for Modification of Judgment, or, Alternative, Motion for New Trial." In this pleading Louis Dugas and Melvin Landry (who made his first appearance in this pleading) alleged that there were errors in calculation in the judgment, *84 and Melvin Landry, being the owner of the growing crops, was an indispensable party defendant to the proceedings and sought to have Melvin Landry intervene so that he, Melvin Landry, could collect for the land leveling and weed control. Additionally, the pleading sought to allow Melvin Landry to have full opportunity to defend the taking.
The trial court denied the motion holding that "it was revealed during the trial that Mr. Landry granted the plaintiff the right to expropriate his property upon payment of the compensation therefor to him. Obviously, that is the reason why he was not a party litigant. He is relegated to his contract. He cannot have an award made to him in this litigation, and his contract for compensation by the plaintiff also." We find that the motion to join Landry as a party defendant was properly overruled.
For these reasons, it is ordered, adjudged and decreed that the trial court's judgment is amended such that Michigan Wisconsin Pipe Line Company is ordered to pay to defendants, Douglas Joseph Walet, Louis Landry, Otto Landry, and Harold Landry the sum of Five thousand, four hundred sixty and 87/100 ($5,460.87) Dollars, together with interest of five per cent (5%) per annum from August 9, 1968, until paid, which is adjudged to be the value of the right of way and damages resulting from the construction of the pipeline together with expenses found to be a direct consequence of construction of the pipeline; specifically reserving to defendants their claim for damages to their 1968 crop located outside the right of way but within a "cut" crossed by the pipeline, and/or any damages sustained by them or their equipment as a result of their attempt to save the 1968 crop and which they can show resulted from construction, installation and/or operation of the pipeline.
All costs are to be paid by Michigan Wisconsin Pipe Line Company.
Amended and affirmed.
HOOD, J., dissents from the refusal to grant a rehearing and assigns written reasons.

ON REHEARING
En Banc.
PER CURIAM.
Plaintiff-Appellee's application for rehearing has directed our attention to certain errors in our original decisions in these six cases, which we undertake to correct.
Our original opinion correctly awarded to all defendants their loss of the 1969 sugar cane crop resulting from landleveling each "cut" crossed by the pipeline. But the formula used was to take the entire acreage in each "cut" crossed by the pipeline, multiplied by the tonnage per acre of sugar cane grown,[1] multiplied by $12.00 per ton. We allowed the landowner 20% of that figure. The tenants were awarded $3.00 per ton on their 80% share of the sugar cane.
We failed to deduct from the award, the acreage within the right of way on each "cut". Defendants were awarded (by the trial court) the total value of the crop within the right of way for 1969.
Furthermore, we erred in allowing recovery for the 1969 crop based on the total number of acres in each "cut". Instead defendants are only entitled to recover for the loss of the number of acres in each "cut" which could have been cultivated in sugar cane for the 1969 crop year except for the landleveling.
By making these corrections, we find that the loss to Douglas J. Walet et al affects 3.383 acres rather than 11.93 acres as used in our original decision.
The loss in the Claude J. Gonsoulin case (#2725), 225 So.2d 86 affects 9.682 acres rather than 10.5 acres.
*85 The loss in the Millard M. Eldridge case (#2726), 225 So.2d 87 affects 1.166 acres rather than 10.61 acres.
The loss in the Edwin A. Gonsoulin case (#2727), 225 So.2d 88 affects 9.547 acres rather than 10.5 acres.
The loss in the Lewis J. Oubre case (#2728), 225 So.2d 90 affects 5.847 acres rather than 6.8 acres.
The loss in the Louis J. Dugas case (#2729), 225 So.2d 91 affects 32.439 acres rather than 42.5 acres.
We set aside the awards in our original decree and the awards of the trial court are now increased as follows:
To Douglas J. Walet et al from $3,313.35 to $3,922.47.
To Claude J. Gonsoulin et al from $3,187.57 to $5,073.97.
To Millard M. Eldridge from $5,171.10 to $5,365.50.
To Edwin A. Gonsoulin et al from $3,213.57 to $5,074.05.
To Lewis J. Oubre et al from $2,298.40 to $3,277.60.
To Louis J. Dugas et al from $3,055.50 to $6,055.50.
It is therefore ordered, adjudged and decreed that the judgment rendered herein be vacated and set aside, and that the trial court's judgment is amended such that Michigan Wisconsin Pipe Line Company is ordered to pay to defendants, Douglas Joseph Walet, Louis Landry, Otto Landry, and Harold Landry the sum of Three thousand nine hundred twenty-two and 47/100 ($3,922.47) Dollars, together with interest of five per cent (5%) per annum from August 9, 1968, until paid, which is adjudged to be the value of the right of way and damages resulting from the construction of the pipeline together with expenses found to be a direct consequence of construction of the pipeline; specifically reserving to defendants their claim for damages to their 1968 crop located outside the right of way but within a "cut" crossed by the pipeline, and/or any damages sustained by them or their equipment as a result of their attempt to save the 1968 crop and which they can show resulted from construction, installation and/or operation of the pipeline. All costs are to be paid by Michigan Wisconsin Pipe Line Company.
With these amendments, the application for rehearing is denied. We reserve to Defendants-Appellants the right to apply for rehearing on this amended decree.
Original decree amended, rehearing denied. Rights reserved to defendants-appellants to apply for rehearing.
HOOD, Judge (dissenting).
I think the judgment which was rendered by the trial court is correct and that the majority has erred in amending it.
My colleagues concede that the defendants in these consolidated cases have failed to establish that they sustained a loss of or damages to their 1968 crops. The majority, nevertheless, has reserved to defendants the right to assert the same claim for damages in a separate action. Ordinarily a claimant who has had his day in court and has failed to prove his case is not given another opportunity to assert the same claim, and I can see no reason to make an exception in this case.
My principal objection, however, is to the conclusion reached by the majority that each of the defendants in these consolidated cases is entitled to an additional award of a specific sum for the damages which he supposedly will sustain as a crop loss for the year 1969. Such an award is made on the assumption that none of the defendants planted a crop during that crop year on any of the affected tracts of land, and on the additional assumption that if a pipe line *86 had not been constructed and defendants had planted a crop in the late fall of 1968 they would make a profit of a specific amount upon harvesting that crop during the fall of this year.
I find nothing in the record which will permit me to assume that each defendant had to relevel his land before planting a 1969 crop on it; or which could justify the assumption that the releveling, if necessary, could not have been done in plenty of time to enable the defendants to plant a 1969 crop. This case was tried before the pipe line was laid, and the evidence indicates that plaintiffs expected to construct the line sometime during the summer of 1968. It seems to me that defendants had adequate time within which to relevel their land after the line was scheduled to be laid and before it became necessary to plant the 1969 crop.
If the majority should be correct in assuming that some damage will be sustained in 1969 because of the laying of this pipeline, then I think the amount of those damages is so speculative that an award cannot be made on the basis of the evidence which was presented. I believe that, at most, the majority should have gone no further than to reserve to defendants the right to assert in a separate action the claim for damages to the 1969 crops, just as was done with reference to their claim for damages to the 1968 crop.
The record, of course, does not indicate whether a crop was or was not planted for the year 1969, because the case was tried long before it was time to do any such planting. Yet, the majority has awarded damages for the complete loss of such a crop on the assumption that one would not be planted. An injustice will have been done if plaintiff is compelled to pay for the loss of a 1969 crop, and it should later be determined that crops actually were planted and harvested by defendants that year.
For these reasons, I respectfully dissent from the refusal of the majority to grant a rehearing.
NOTES
[1] The trial court awarded damages for the total loss of the crop on the right of way for three years.
[2] While two landowners received 25% of the crop, these were required to furnish a portion of the expenses relating to planting, cultivating and/or harvesting the crop. Essentially each landowner nets approximately 20% of the crop.
[1] As established by the history of production on the lands involved.