695 F.2d 872
 UNITED STATES of America, Plaintiff-Appellee,
v.
131.68 ACRES OF LAND, MORE OR LESS, SITUATED IN ST. JAMES
PARISH, STATE OF LOUISIANA, et al., Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
4.52 ACRES OF LAND, MORE OR LESS, SITUATED IN ST. JAMES
PARISH, STATE OF LOUISIANA, et al., Defendants-Appellants.
 No. 81-3280.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 17, 1983.
 
 John L. Peytavin, Lutcher, La., for defendants-appellants.
 Martin W. Matzen, Jacques B. Gelin, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before GOLDBERG, GEE and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 The transformation of the Cantrelle Reach of the Mississippi River from agriculture to industry has presented three issues for our decision including the age-old legal problem of how to measure damages for the destruction of crops. Appealing from a judgment in this land condemnation case the landowners and lessees argue that the trial court erred in its valuation of the crop in place, in denying them a hearing before dispossessing and in certain rulings upon matters of valuation of the land and evidence. Concluding that in the absence of controlling precedent the district court followed an economically sound approach to measuring crop damages, and that the additional attacks upon the judgment are without merit, we affirm.
 
 
 2
 In May 1978 the government filed a complaint under 40 U.S.C. Sec. 258a for the taking, part in fee and part in perpetual easement, of 131.68 acres of land out of a 586-acre tract in St. James Parish near the Mississippi River. As required by 40 U.S.C. Sec. 258a, the government deposited estimated compensation for the land. The government sought to use the land for the construction and operation of Strategic Petroleum Reserve facilities. On the same day that the complaint was filed, the district judge without a hearing granted the United States possession of the land. On July 30, 1979, the government filed a complaint to take an additional 4.52 acres for the same purposes from the same tract. The government deposited estimated compensation and on the following day was granted possession of the land. The cases were consolidated for trial.
 
 Sugar Cane
 
 3
 Approximately 134 acres of the condemned land were under a crop lease for sugar cane. The lessees were planting and harvesting in a four-year rotation, so that at any given time one fourth of the land was in plant cane, one fourth in first year stubble, one fourth in second year stubble, and one fourth fallow.
 
 
 4
 Sugar cane has an unusual growing cycle, as described by the Louisiana Court of Appeals:
 
 
 5
 Sugar cane is a crop that must be cultivated over a period of approximately fourteen months. It is planted in August or early September and is not harvested until the end of October, or in November and December of the following year. After harvesting, the crop reappears for two successive seasons (stubble cane) and is harvested in each of the two following years. Good farming practice allows three harvests (plant, first year stubble and second year stubble). In the fourth year, the land is allowed to be fallow, or is planted with peas or corn to enrich the soil for future plantings to come.
 
 
 6
 Michigan Wisconsin Pipe Line Co. v. Walet, 225 So.2d 76, 80 (La.Ct.App.1969).
 
 
 7
 At trial, the government's expert witness testified that the lessees were entitled to the revenue they would have received from the 1978 crop, minus their 1978 harvesting costs, plus two thirds of the costs of planting the acreage.[1] Making an assumption, favorable to the lessees, that all acreage was in the plant cane stage at the time of taking,[2] the government's expert concluded that $82,931 was a proper damage amount. The lessees' expert witness testified that three years' net profits had been taken, given the growing cycle of sugar cane. He calculated net profits for 1978 by subtracting harvesting costs from the revenue that the lessees would have received, and for 1979 and 1980 by subtracting "total production cost" from projected revenue. The lessees' expert concluded that just compensation for loss of crops required a damage award of $231,052.44.[3]
 
 
 8
 The district court adopted the government expert's approach. It reasoned that "compensating the defendants as if they had lost three years of sugar cane crops would impermissibly compensate them for loss of future profits" because the government had already paid the market value of the land. Accordingly, it entered a judgment ordering compensation of $672,658.00 for the land, $1,048.00 for mineral subordination, and $82,931.00 for crop damages.
 
 
 9
 Louisiana law here governs what is a property interest compensable under the Fifth Amendment. United States v. 145.30 Acres of Land, Etc., 385 F.Supp. 699, 700-701 (W.D.La.1974), aff'd without opinion, 524 F.2d 1231 (1975). Growing crops are property under Louisiana law. Humble Pipe Line Co. v. Wm. T. Burton Industries, Inc., 253 La. 166, 217 So.2d 188, 191 (1968). State law, however, does not control the measure of damages. That is a matter of federal law. Georgia Power Co. v. Sanders, 617 F.2d 1112, 1119 (5th Cir.1980). Under federal law, the "guiding principle of just compensation ... is that the owner 'must be made whole but is not entitled to more.' " United States v. 564.54 Acres of Land, Etc., 441 U.S. 506, 516, 99 S.Ct. 1854, 1860, 60 L.Ed.2d 435 (1979) (quoting Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934)). "Just" encompasses the public who pay for the taking as well as the individual property owner. Id. 441 U.S. at 512, 99 S.Ct. at 1858. Despite the open-ended definition of just compensation its inquiry is recompense for economic loss. The objective is to not displace the owner's economic position. That is, the government must, and need do no more than, put the owner in "... as good a position pecuniarily as if his property had not been taken." Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934).
 
 
 10
 We believe that the district court used the correct formula for measuring damages for loss of the three-year sugar cane crop. The landowners received the difference in the market value of their tract of land before and after the taking. That sum included compensation for lost opportunities to earn profits from the land after the taking. Adding compensation for the loss of net profits after the date of the taking would thus have resulted in double compensation.[4] If the lessees had received their net profits for 1979 and 1980, they would have been awarded in effect two years of profits from government land. See King v. United States, 504 F.2d 1138, 1142 (Ct.Cl.1974). This common sense notion is expressed by the so-called "undivided fee rule," which provides that the division of a fee into separate interests cannot increase the amount of compensation that the condemnor has to pay for the taking of the fee. See United States v. Buhler, 305 F.2d 319, 331 (5th Cir.1962) (ordering trial court on remand to consider whether total amount given to landowners and rice tenants exceeded fair market value of land taken). By awarding the lessees their net profits for the year of the taking and the costs they had already incurred for the subsequent years' crops, the district court properly followed the "undivided fee rule" and avoided double-counting.[5]
 
 
 11
 Some federal courts have awarded as damages for the destruction of an immature crop its market value at maturity minus costs of further cultivation, harvesting, and marketing. United States v. 576.734 Acres of Land, Etc., 143 F.2d 408, 409-410 (3d Cir.1944); United States v. 729.773 Acres of Land, Etc., 531 F.Supp. 967, 974-975 (D.Haw.1982) (adopting harvest value minus projected cultivation, harvesting and marketing costs as formula for measuring damages for loss of sugar cane crops). In Daily v. United States, 90 F.Supp. 699, 701 (Ct.Cl.1950), the Court of Claims held:
 
 
 12
 The most acceptable method for arriving at the value of a crop at the time of its destruction, assuming it had no market value at that time, is to first estimate the probable yield at harvest had the crop not been destroyed, then determine the market value of the crop at harvest and from that deduct the value and amount of labor and expenses which would have been necessary to continue the cultivation and marketing of the crop after its destruction.
 
 
 13
 In none of these cases, however, did the court expressly decide the question that confronts us here--whether net profits ought to be awarded for a crop that matures after the year of the taking. In Daily, for example, the court's concern was measuring damages for the destruction of a banana squash crop in July that would have been harvested that fall. Id.
 
 
 14
 In sum, we believe the district court properly awarded as damages the profits that would have been earned in the year of the taking plus the costs that had been incurred toward subsequent years.
 
 Right to a Hearing
 
 15
 The landowners and the lessees maintain that both the Congress and the Constitution secured their "right" to a hearing before they were dispossessed of their land. We disagree. The Fifth Amendment does not afford them such a right. "The question on which issue is joined is whether the government may exercise its eminent domain power consistently with the Fifth Amendment by physically seizing property without any prior notice, hearing, or compensation. The answer to this question is yes." Stringer v. United States, 471 F.2d 381, 383 (5th Cir.), cert. den., 412 U.S. 943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973).
 
 
 16
 The landowners and the lessees also rely on the Energy Policy and Conservation Act, 42 U.S.C. Secs. 6201-6422. This legislation provided the authority for the taking here, but not a right to a hearing. Section 6239(g) provides:
 
 
 17
 Before any condemnation proceedings are instituted, an effort shall be made to acquire the property involved by negotiation, unless, the effort to acquire such property by negotiation would, in the judgment of the Secretary be futile or so time-consuming as to unreasonably delay the implementation of the Strategic Petroleum Reserve Plan, because of (1) reasonable doubt as to the identity of the owners, (2) the large number of persons with whom it would be necessary to negotiate, or (3) other reasons.
 
 
 18
 We need not decide whether Sec. 6239(g) is hortatory, as urged by the government, or mandatory, as urged by the landowners and lessees. In any event, it does not furnish a right to a prior due process hearing.
 
 
 19
 Nor does the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. Secs. 4601-4655, afford the landowners and the lessees a right to a hearing. The guidelines spelled out in Sec. 4651 for acquisition of real property are only that. Section 4602(a) states that "[t]he provisions of section 4651 of this title create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation." Section 4602(b) adds, "Nothing in this chapter shall be construed as creating in any condemnation proceedings brought under the power of eminent domain, any element of value or damage not in existence immediately prior to [the effective date of the Act]." See United States v. 320.0 Acres of Land, Etc., 605 F.2d 762, 822 n. 134 (5th Cir.1979); United States v. 410.69 Acres of Land, Etc., 608 F.2d 1073, 1074 n. 1 (5th Cir.1979).
 
 Valuation of the Land
 
 20
 The landowners also contend that the district court took several impermissible steps in valuing the land. First, they claim that one of the two comparable sales that the district court relied upon was not actually a sale but a mortgage. The government did attempt to introduce a mortgage document as evidence of the sale. The document was excluded on the landowners' objection, however, and the government's witness went on to testify that the sale of the property in question had in fact occurred, although it was accomplished by means of a stock transfer.
 
 
 21
 Second, the landowners contend that the district court should have made a 10% rather than a 2% upward adjustment in the per acre prices derived from comparable sales because of industrial leases on the tract.[6] In a related argument, they contend that a 50% rather than a 40% upward adjustment should have been made for proximity to CAPLINE, a common carrier oil pipeline that was adjacent to the landowners' property.
 
 
 22
 These challenges to the district court's calculation of damages raise issues of fact, not issues of law. The government's expert appraiser made no adjustment for the leases and only a 30% adjustment for CAPLINE. He testified that the just compensation for the taking of the land was $600,587.50, whereas the trial judge found that it was $672,658.00. "The weighing of the evidence in a condemnation proceeding is within the sole purview of the fact-finder, and it is not for this court to reweigh the evidence." United States v. 6,162.78 Acres, Etc., 680 F.2d 396, 398 (5th Cir.1982). Neither the subsidiary findings of the district court nor its determination of just compensation for the land were clearly erroneous.
 
 
 23
 Third, the landowners object to the district court's $432 downward adjustment to the per acre price of one of the two comparable sales, claiming that this adjustment lacked supporting proof because the government's expert witness did not testify about it. It appeared in his written appraisal, however, and the written appraisal was admitted into evidence.
 
 
 24
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 As to the approximately two acres of crops that were taken in 1979, the government's expert testified that the lessees were entitled to the revenue from the 1979 crop, minus their 1979 harvesting costs, plus two-thirds of planting costs
 
 
 [2]
 As noted, the testimony was that one fourth of the entire tract was in fallow at the time of the taking. The record does not reveal what percentage of the land actually taken was in fallow
 
 
 [3]
 This figure included net profits of $66,629.79 for 1978, $46,941.00 for 1979, and $117,481.65 for 1980. Sugar prices more than doubled between 1978 and 1980
 
 
 [4]
 Although the taking occurred in May 1978 and the harvesting of the 1978 crop did not occur until October, the district court properly rounded off in awarding the lessees their net profits from the 1978 growing season
 
 
 [5]
 No party below requested the district court to apportion the compensation between the landowners and the lessees. The land taken was not valued as a reversionary interest subject to a lease but as a fee interest. That is, the effect here is the same as if there were no lease. We review the case as tried
 
 
 [6]
 The industrial leases were not on the part of the tract that was taken in fee and hence were not affected by the takings