UNITED STATES *v.* 564.54 ACRES OF LAND, MORE OR
LESS, SITUATED IN MONROE AND PIKE
COUNTIES, PENNSYLVANIA, ET AL.

No. 78–488.   Argued March 27, 1979—Decided May 14, 1979

Marshall, J., delivered the opinion of the Court, in which all other Members joined except Powell, J., who took no part in the consideration or decision of the case. White, J., filed a concurring opinion, *post*, p. 517.

*Deputy Solicitor General Barnett* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Assistant Attorney General Liotta, Sara Sun Beale, Peter R. Steenland, Jr., Raymond N. Zagone,* and *John J. Zimmerman.*

*H. Ober Hess* argued the cause for respondent Southeastern Pennsylvania Synod of the Lutheran Church in America. With him on the brief was *Arthur Makadon.*

Mr. Justice Marshall delivered the opinion of the Court.

At issue in this case is the proper measure of compensation when the Government condemns property owned by a private nonprofit organization and operated for a public purpose. In

particular, we must decide whether the Just Compensation Clause of the Fifth Amendment [1] requires payment of replacement cost rather than fair market value of the property taken.

## I

Respondent, the Southeastern Pennsylvania Synod of the Lutheran Church in America, operates three nonprofit summer camps along the Delaware River. In June 1970, the United States initiated a condemnation proceeding to acquire respondent's land for a public recreational project. Before trial, the Government offered to pay respondent $485,400 as the fair market value of its property. Respondent rejected the offer and demanded approximately $5.8 million, the asserted cost of developing functionally equivalent substitute facilities at a new site. This substantial award was necessary, respondent contended, because the new facilities would be subject to financially burdensome regulations from which existing facilities were exempt under grandfather provisions.

In a pretrial ruling, the District Court held that the "substitute facilities," or replacement cost, measure of compensation was available only to governmental condemnees, and that respondent therefore was entitled only to the fair market value of its property. App. 38–48. On interlocutory appeal, the Court of Appeals for the Third Circuit reversed. 506 F. 2d 796 (1974). Relying on other appellate decisions,[2] the Court of Appeals determined that in condemnations of property belonging to States or their subdivisions, the Fifth Amendment requires an award of replacement cost "so that

---

[1] The Fifth Amendment of the Constitution provides in pertinent part: "nor shall private property be taken for public use, without just compensation."

[2] See, e. g., United States v. Certain Property in Borough of Manhattan, 403 F. 2d 800 (CA2 1968); United States v. Board of Education of Mineral County, 253 F. 2d 760 (CA4 1958); Washington v. United States, 214 F. 2d 33 (CA9), cert. denied, 348 U. S. 862 (1954); Fort Worth v. United States, 188 F. 2d 217 (CA5 1951).

the functions carried out by or on behalf of members of the community may be continued." *Id.,* at 799–800.[3]  Since the Fifth Amendment refers expressly to private but not to public property, the court reasoned that the Framers could not have "intended to impose a greater obligation of indemnification" toward public entities than toward private owners. *Id.,* at 801. Accordingly, the Court of Appeals applied standards governing condemnations of publicly owned property, and held that substitute-facilities compensation was available to private nonprofit owners if there was no "ready market" for the condemned property and if the facilities were "reasonably necessary to public welfare." *Id.,* at 800. The case was remanded to the District Court for consideration of whether respondent's property met this test.

After a 10-day trial, the District Court instructed the jury regarding the prerequisites of a substitute-facilities award. Specifically, the court charged that there was no "ready market" for respondent's facilities if "the fair market value of the condemned property [was] substantially less than the cost of constructing functionally equivalent substitute facilities." See 576 F. 2d 983, 992 n. 9 (1978). The District Court further instructed that the property was "reasonably necessary to public welfare" if it "fulfill[ed] a community need or purpose." See *id.,* at 995 n. 16. The jury found that respondent was not entitled to substitute-facilities compensation, and after considering additional evidence, awarded $740,000 as the fair market value of the property.

---

[3] This Court has not passed on the propriety of substitute-facilities compensation for public condemnees. Although the Court of Appeals cited *Brown* v. *United States,* 263 U. S. 78 (1923), as "the genesis of the substitution of facilities method of measuring fair compensation," 506 F. 2d, at 802, that case addressed the scope of the Government's condemnation power, not the compensation requisite under the Fifth Amendment. In light of our disposition of this case, we express no opinion on the appropriate measure of compensation for publicly owned property.

A different panel of the Court of Appeals reversed. *Id.*, at 996. Although the court found that the jury instructions on the ready-market issue were not fundamentally in error,[4] it disagreed with the District Court's interpretation of the reasonable-necessity requirement. Under the Court of Appeals' theory, this test was met if the facility "provide[d] a benefit to the community that [would] not be as fully provided after the facility [was] taken." *Id.*, at 995. Because the jury instruction had been framed in terms of necessity rather than community benefit, the court concluded that a new trial was required. One judge, concurring, agreed that the trial court's charge had not been consistent with the Court of Appeals' interlocutory decision, but argued that the prior opinion, although controlling, was incorrect. *Id.*, at 996–1000. The third member of the panel dissented on the ground that the District Court had adhered to the principles previously enunciated in the interlocutory opinion. *Id.*, at 1001–1010.

We granted certiorari, 439 U. S. 978 (1978), and now reverse.

## II

### A

In giving content to the just compensation requirement of the Fifth Amendment, this Court has sought to put the owner of condemned property "in as good a position pecuniarily as if his property had not been taken." *Olson* v. *United States*, 292 U. S. 246, 255 (1934).[5] However, this principle of in-

---

[4] The Court of Appeals, however, did seek to clarify the ready-market criterion, holding that "regardless of whether the Synod could have sold the camps, and regardless of whether the camps had fair market value, this condition . . . is met if the Synod could not have replaced the camps' facilities in the marketplace for a cost roughly equivalent to the fair market value of the camps." 576 F. 2d, at 991.

[5] Accord, *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 326 (1893); *United States* v. *Miller*, 317 U. S. 369, 373 (1943); *United States* v. *Virginia Electric & Power Co.*, 365 U. S. 624, 633 (1961); *United*

demnity has not been given its full and literal force. Because of serious practical difficulties in assessing the worth an individual places on particular property at a given time, we have recognized the need for a relatively objective working rule. See *United States* v. *Miller,* 317 U. S. 369, 374 (1943); *United States* v. *Cors,* 337 U. S. 325, 332 (1949). The Court therefore has employed the concept of fair market value to determine the condemnee's loss. Under this standard, the owner is entitled to receive "what a willing buyer would pay in cash to a willing seller" at the time of the taking. *United States* v. *Miller, supra,* at 374; accord, *City of New York* v. *Sage,* 239 U. S. 57, 61 (1915); *United States* v. *Virginia Electric & Power Co.,* 365 U. S. 624, 633 (1961); *Almota Farmers Elevator & Warehouse Co.* v. *United States,* 409 U. S. 470, 474 (1973).

Although the market-value standard is a useful and generally sufficient tool for ascertaining the compensation required to make the owner whole,[6] the Court has acknowledged that such an award does not necessarily compensate for all values an owner may derive from his property. Thus, we have held that fair market value does not include the special value of property to the owner arising from its adaptability to his particular use. *United States* v. *Miller, supra,* at 374–375; *United States* v. *Cors, supra,* at 332. As Mr. Justice Frankfurter wrote for the Court in *Kimball Laundry Co.* v. *United States,* 338 U. S. 1, 5 (1949):

> "The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, how-

---

*States* v. *Reynolds,* 397 U. S. 14, 16 (1970); *Almota Farmers Elevator & Warehouse Co.* v. *United States,* 409 U. S. 470, 473–474 (1973).

[6] The standard is most accurate with respect to readily salable articles such as merchandise, because the value of such property is ordinarily what it can command in the marketplace. See *United States* v. *Toronto, Hamilton & Buffalo Nav. Co.,* 338 U. S. 396, 404 (1949).

ever, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship."

See 1 L. Orgel, Valuation Under the Law of Eminent Domain § 14 (2d ed. 1953). In short, the concept of fair market value has been chosen to strike a fair "balance between the public's need and the claimant's loss" upon condemnation of property for a public purpose. *United States* v. *Toronto, Hamilton & Buffalo Nav. Co.,* 338 U. S. 396, 402 (1949); see also *United States ex rel. TVA* v. *Powelson,* 319 U. S. 266, 280 (1943).

But while the indemnity principle must yield to some extent before the need for a practical general rule, this Court has refused to designate market value as the sole measure of just compensation. For there are situations where this standard is inappropriate. As we held in *United States* v. *Commodities Trading Corp.,* 339 U. S. 121, 123 (1950):

"[W]hen market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards. . . . Whatever the circumstances under which such constitutional questions arise, the dominant consideration always remains the same: What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?"

See also *United States* v. *Cors, supra,* at 332; *United States* v. *Toronto, Hamilton & Buffalo Nav. Co., supra,* at 402; *United States* v. *Miller, supra,* at 374.[7] Hence, we must determine whether application of the fair-market-value standard here would be impracticable or whether an award of market value would diverge so substantially from the indemnity principle as to violate the Fifth Amendment.

## B

The instances in which market value is too difficult to ascertain generally involve property of a type so infrequently traded that we cannot predict whether the prices previously paid, assuming there have been prior sales, would be repeated in a sale of the condemned property. See *United States* v. *Toronto, Hamilton & Buffalo Nav. Co., supra,* at 402; cf. *United States* v. *Miller, supra,* at 374–375. This might be the case, for example, with respect to public facilities such as roads or sewers. But respondent's property does not fall in this category.[8] There was a market for camps, albeit not an extremely active one. The Government's expert witness presented evidence concerning 11 recent sales of comparable facilities in the vicinity, and estimated that respondent's

---

[7] To be sure, the issue in these cases was whether the asserted market value exceeded the compensation necessary to indemnify the condemnees. But "the principle, as stated in the *Commodities Trading* opinion, must work both ways." *In re Valuation Proceedings,* 445 F. Supp. 994, 1031 (Sp. Ct. R. R. R. A.) (Friendly, J.), appeals dism'd without prejudice *sub nom. Blanchette* v. *U. S. Railway Assn.,* 434 U. S. 993 (1977).

[8] The jury's determination that the camps had a market value of $740,000 does not resolve the issue whether market value was in fact ascertainable. That issue depends on whether evidence could feasibly be obtained to present a jury question on the appropriate market value. Such an inquiry is related to the one an appellate court would undertake in reviewing the sufficiency of the evidence to support a jury's market-value determination. However, in the latter circumstance, the issue would be whether evidence was *in fact presented* from which the jury could rationally arrive at its result.

camps could have been sold within six months to a year after they were offered for sale. Tr. 256–258, 263–264, 269–276. Indeed, respondent's own expert testified that he had prepared an appraisal of the camps' fair market value as of the date of the taking. App. 143–144. And the Court of Appeals implicitly acknowledged that the market value of nonprofit property is ordinarily ascertainable since application of the court's "ready market" criterion requires assessment of fair market value. See n. 4, *supra*. Thus, it seems clear that respondent's property had a readily discernible market value. The only remaining inquiry is whether such an award would impermissibly deviate from the indemnity principle.

Emphasizing that the primary value of the condemned property lies in the use to which it is put, respondent argues that compensating only for market value would be unjust in the present context. Because new facilities would bear financial burdens imposed by regulations to which the existing camps were not subject, an award of market value would preclude continuation of respondent's use. Brief for Respondent 5. Respondent therefore concludes that such a recovery would be insufficient to indemnify for its loss. See 506 F. 2d, at 798.

However, it is not at all unusual that property uniquely adapted to the owner's use has a market value on condemnation which falls far short of enabling the owner to preserve that use. Such a situation may often arise, for example, where a family home has been built to the owner's tastes, but is old and deteriorated, or where property, like respondent's camps, is exempt from regulations applicable to new facilities. Cf. 1 L. Orgel, *supra*, § 37, pp. 172–173. Yet the Court has previously determined that nontransferable values arising from the owner's unique need for the property are not compensable, and has found that this divergence from full indemnification does not violate the Fifth Amendment. See *supra*, at 511–512.

We are unable to discern why a different result should obtain here. That respondent is a nonprofit organization may

provide some basis for distinguishing it from business enter-
prises, since the uses to which commercial property is put can
often be valued in terms of the capitalized earnings produced.
See 506 F. 2d, at 799; 1 L. Orgel, *supra*, at § 157.  Cf. *United
States* v. *Toronto, Hamilton & Buffalo Nav. Co.*, 338 U. S.,
at 403.  But there is no reason to treat respondent differently
from the many private homeowners and other noncommercial
property owners who neither derive earnings from their prop-
erty nor hold it for investment purposes.  Unless the Just
Compensation Clause mandates a Government subsidy for
nonprofit organizations, a proposition we find patently im-
plausible, respondent's nonprofit status does not require us to
reject application of the fair-market-value standard.

Nor is it relevant in this case whether respondent's camps
were reasonably necessary to the public welfare.  In con-
demnations of property owned by public entities, lower courts
have applied the reasonable-necessity standard to determine if
the entity has an obligation to continue providing the facili-
ties taken.  See, *e. g.*, 506 F. 2d, at 800; *United States* v.
*Streets, Alleys & Public Ways in Stoutsville*, 531 F. 2d 882, 886
(CA8 1976); *United States* v. *Certain Property in Borough of
Manhattan*, 403 F. 2d 800 (CA2 1968).  This duty may be
legally compelled or arise from necessity; "the distinction has
little practical significance in public condemnation."  *Id.*, at
803.  If the condemnee has such a duty to replace the prop-
erty, these courts have reasoned that only an award of the
costs of developing requisite substitute facilities will compen-
sate for the loss.

Whatever the merits of this reasoning with respect to public
entities, see n. 3, *supra,* it does not advance analysis here.  For
respondent is under no legal or factual obligation to replace
the camps, regardless of their social worth.  As a private
entity, respondent is free to allocate its resources to serve its
own institutional objectives, which may or may not correspond
with community needs.  Awarding replacement cost on the

theory that respondent would continue to operate the camps for a public purpose would thus provide a windfall if substitute facilities were never acquired, or if acquired, were later sold or converted to another use.

Finally, that the camps may have benefited the community does not warrant compensating respondent differently from other private owners. The community benefit which the camps conferred might provide an indication of the public's loss upon condemnation of the property. But we cannot accept the Court of Appeals' conclusion that this loss is relevant to assessing the compensation due a private entity. The court noted that "[o]ne rationale for the substitute facilities measure is to indemnify not only the owner of the condemned facilities, but those who have an interest in the continuing existence of the facilities, in this case, according to the Synod, the general public." 576 F. 2d, at 989 n. 4. The guiding principle of just compensation, however, is that the *owner* of the condemned property "must be made whole but is not entitled to more." *Olson* v. *United States,* 292 U. S., at 255. Respondent did not hold its property as the public's trustee and thus is not entitled to be indemnified for the public's loss. Moreover, many condemnees use their property in a manner that confers a benefit on the community, and there is no sound basis for considering this factor only in condemnations of property owned by nonprofit organizations. And to make the measure of compensation depend on a jury's subjective estimation of whether a particular use "benefits" the community would conflict with this Court's efforts to develop relatively objective valuation standards.

In sum, we find no circumstances here that require suspension of the normal rules for determining just compensation. Respondent, like other private owners, is not entitled to recover for nontransferable values arising from its unique need for the property. To the extent denial of such an award departs from the indemnity principle, it is justified by the

necessity for a workable measure of valuation. Allowing respondent the fair market value of its property is thus consistent with the "basic equitable principles of fairness," *United States* v. *Fuller*, 409 U. S. 488, 490 (1973), underlying the Just Compensation Clause.

The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice Powell took no part in the consideration or decision of this case.

Mr. Justice White, concurring.

The Court rejects the claim that the measure of compensation in this case is the cost of substitute facilities rather than the fair market value of the taken property, here camps owned by a private, nonprofit corporation. I am in full agreement. The substitute-facilities doctrine is unrelated to fair market value and does not depend on whether fair market value is readily ascertainable; rather, it unabashedly demands additional compensation over and above market value in order to allow the replacement of the condemned facility.[1] In those cases where it has been applied, primarily where public facilities have been condemned, the basic premise is that the condemnee is under some obligation to continue the functions performed on the taken property.[2] But I do not understand

___

[1] See 576 F. 2d 983, 991 (CA3 1978), quoted *ante*, at 510 n. 4; *United States* v. *Streets, Alleys & Public Ways in Stoutsville*, 531 F. 2d 882 (CA8 1976); *United States* v. *Certain Property in Borough of Manhattan*, 403 F. 2d 800 (CA2 1968); *United States* v. *Certain Land in Borough of Brooklyn*, 346 F. 2d 690 (CA2 1965); *United States* v. *Board of Education of Mineral County*, 253 F. 2d 760 (CA4 1958); National Conference of Commissioners on Uniform State Laws, Uniform Eminent Domain Code, § 1004 (b).

[2] See, *e. g.*, *United States* v. *Certain Land in Borough of Brooklyn, supra,* at 694; 576 F. 2d, at 992–995.

how a duty to replace the condemned facility justifies paying more than market value. Obviously, replacing the old with a new facility will cost more than the value of the old, but the new facility itself will be more valuable and last longer.[3] This is true with respect to condemnation of any facility, whether or not there is an obligation to reproduce it, and I had not understood the Just Compensation Clause to guarantee subsidies to either private or public projects. Similarly, if more demanding building codes or other regulations will enhance the cost of replacement, it is reasonable to assume that compliance itself will be of some benefit to the owner and hence need not be financed by the condemnor.

It may be that a condemnee's obligation to continue the function performed on the condemned property and hence to replace the facility taken will result in loss of value in that the condemnee does not have the option of investing his fair-market-value award in a project that will provide the condemnee with greater net benefits than would replacement of the taken facility. But the existing law imposing the obligation presumably embodies the policy judgment that alternative projects, from which the condemnee might or might not derive more benefits, should not be made available to the condemnee. Even if some incremental loss due to legal constraints on the obligated condemnee's options is thus imposed, it is sheer speculation to assume that this loss will be equal to the full increase in cost of the facility to be reproduced or replaced. It seems to me that the argument for enhanced compensation to the obligated condemnee is nothing more than a particularized submission that the award should exceed

---

[3] The substitute-facilities measure applied by the Court of Appeals in this case appears to contemplate payment of reproduction costs, not replacement costs, see *id.*, at 999, and n. 2 (Stern, J., concurring); 506 F. 2d 796, 799–800 (CA3 1974). As noted in *United States* v. *Certain Property in Borough of Manhattan, supra,* at 804, courts applying the substitute-facilities measure have taken different positions regarding whether depreciation should be deducted from the cost of a new facility.

fair market value because of the unique uses to which the property has been put by the condemnee or because of the unique value the property has for it.

I thus agree with the Court that the Just Compensation Clause does not require payment of the cost of a substitute facility where the condemnee is a private organization, even if it could be said that such an owner is in some sense obligated to replace the property [4] or that the public has a stake in the continuance of the function that is being conducted on the taken property.[5]  I also have substantial doubt that the Clause should be any differently construed and applied where public property is condemned, whether or not the function conducted on the property must be continued at another location.[6]  That issue, however, is not before the Court and is expressly put aside for another day.

---

[4] The Court states that respondent "is under no legal or factual obligation to replace the camps. . . ." *Ante*, at 515. Although respondent, which is subject to the Pennsylvania Nonprofit Corporation Act of 1972, 15 Pa. Cons. Stat. § 7549 (1975), apparently is not legally obliged to replace its camps, other private, nonprofit enterprises may be under a legal obligation—imposed by their own articles of incorporation, by the terms under which gifts are made to them, or directly by state law—to continue financing of certain facilities or functions.  Indeed, private organizations operated for profit may be under contractual or other legal obligation to replace a condemned facility.

[5] For purposes of deciding whether an obligation to replace requires a condemnation award greater than market value, it is seemingly irrelevant to whom the benefits of ownership may be said to accrue, be this the "public" or private entities.

[6] Of course, even if this is the proper interpretation of the Just Compensation Clause, Congress could enact legislation providing for compensation under the substitute-facilities approach in those situations in which the United States condemns public property.