789 F.2d 715
 UNITED STATES of America, Plaintiff-Appellee/Cross-Appellant,
v.
129.4 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF YUMA,
STATE OF ARIZONA, Fred W. Kamrath, et al., and
Unknown Owners, Defendants,
and
Yuma Mesa Irrigation and Drainage District,
Defendant-Appellant/Cross-Appellee.
 Nos. 85-1811, 85-1893.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 13, 1986.
Decided May 8, 1986.
 
 Claire L. McGuire, Robert L. Klaquist, U.S. Dept. of Justice, Washington, D.C., for U.S.
 Thaddeus G. Baker, Yuma, Ariz., for defendants.
 Appeal from the United States District Court for the District of Arizona.
 Before SNEED and KOZINSKI, Circuit Judges, and SOLOMON*, District Judge.
 SNEED, Circuit Judge:
 
 
 1
 The Yuma Mesa Irrigation & Drainage District (the District) appeals from a decision which, inter alia, awarded it compensation for condemnation of land for a Navy base in Arizona. In a prior decision, United States v. 129.4 Acres of Land, 572 F.2d 1385 (9th Cir.1978) [hereinafter cited as 129.4 Acres I ], aff'g 446 F.Supp. 1 (D.Ariz.1976), we held that the District must be compensated for the decrease in its assessment base caused by the condemnation of the land in question. On remand, the district court calculated the amount of compensation due to the District, 602 F.Supp. 750 (D.Ariz.1985), and entered a declaratory judgment which held that the Navy was entitled to receive water from the District in return for payment of the compensation award. Both parties appealed to this Court. We affirm the declaratory judgment entitling the Navy to receive the water but modify slightly the amount of the payment that must be made by the Navy.
 
 I.
 FACTS
 
 2
 In 1975, the United States instituted a condemnation action against 129.4 acres of land near the Navy's Marine Corps Air Station in Yuma, Arizona. 77.4 acres of the land lie within the Yuma Mesa Irrigation and Drainage District, part of the Yuma Mesa Division of the Gila Reclamation Project. In this dispute, we do not examine the arrangements between the Navy and the surface owners, but only the dispute between the Navy and the District.
 
 
 3
 The Gila Project dates back to the Act of Dec. 21, 1928, Sec. 11, ch. 42, 45 Stat. 1057, 1063-64. Pursuant to that act and later federal statutes, the federal government has diverted water from the Colorado River at Imperial Dam through the Gila Main Canal to areas covered by the Gila Project. The District was formed under Arizona state law to repay the Secretary of the Interior for the District's pro-rata share of the federal government's expenses in constructing, operating, and maintaining this project. On May 26, 1956, the District executed a contract providing for repayment of those expenses. Under that contract, the construction expenses will be repaid over a period of sixty years. The record does not disclose how the project will be conducted thereafter; we assume, however, that landowners will remain subject to assessments to cover ongoing costs of operation and maintenance. Under the current scheme, payment of the annual operation and maintenance assessment entitles each landowner to receive nine acre-feet per acre of water annually. Landowners must pay an additional amount for water in excess of this amount. Nonetheless, the District does not break down its costs between those of providing the basic nine acre-feet of water and those of providing excess water. Instead, it customarily fixes the amount of the annual assessment and the price of the excess water to assure that the total revenues equal the total expenses. See Cross-Appellee's Supplemental Excerpt of Clerk's Record exhibit "S" [hereinafter cited as S.E.R.].
 
 
 4
 Bowing to the authority of Adaman Mutual Water Co. v. United States, 278 F.2d 842 (9th Cir.1960), the Navy conceded at the outset that it was obligated to pay the share of the construction costs attributable to the condemned land. That payment came to $16,147.44 and is not disputed here. 129.4 Acres I required the Navy to compensate the District for the loss of operation and maintenance assessments caused by condemnation of this land. On remand, the district court required the Navy to make a lump sum payment based on the expected cost of supplying water over the life of the contract. The Navy filed a motion for a declaration that, after payment of those charges, it would be entitled to future delivery of water in the same amounts as the other landowners in the area. The district court granted that motion. The District here challenges the portion of the district court's order requiring the providing of water to the Navy by contending that the requirement violates both the Fifth Amendment and federal statutory law. The Navy cross-appeals, challenging the amount of the award.
 
 II.
 ANALYSIS
 
 5
 A. Must the District Supply the Water?
 
 
 6
 1. Jurisdiction.--Initially, the District challenges the district court's jurisdiction to order the District to deliver water to the Navy. The challenge lacks merit. The authorities the District cites are inapposite. For example, in United States v. 40.60 Acres of Land, 483 F.2d 927 (9th Cir.1973) (per curiam), we held that a district court in a condemnation case did not have jurisdiction over a counterclaim filed by a public utility whose facilities were expressly excluded from the declaration of condemnation. Both of the other cases cited involve similar facts. See United States v. 3,218.9 Acres of Land, 619 F.2d 288 (3d Cir.) (owners of expressly uncondemned mineral interests), cert. denied, 449 U.S. 872, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980); United States v. 101.88 Acres of Land, 616 F.2d 762 (5th Cir.1980) (complaint by owners of neighboring land). Each of these cases involved an attempt by an owner of interests in property expressly not condemned to litigate alleged inverse condemnation claims during the express condemnation proceedings.
 
 
 7
 This case, however, is different. It involves a dispute over the water rights appurtenant to the fee simple in the land taken by the Navy. These rights were not expressly excluded from the declaration. If they are a part of what was taken, the Navy is entitled to their use. Moreover, the District is hardly in a position to complain. After all, it was the District, in 129.4 Acres I, that sought a judgment from this Court that the Navy must compensate it for the loss of the ability to collect assessments for the water.
 
 
 8
 We hold, therefore, that the district court had jurisdiction under 28 U.S.C. Secs. 1331 and 2201 over the Navy's counterclaim for a declaratory judgment.
 
 
 9
 2. Constitutional Claim.--The District's constitutional claim also must fail. Our discussion begins with Adaman Mutual Water Co. v. United States, 278 F.2d 842 (9th Cir.1960). That case discussed the compensation required for condemnation of land within a water district. There, somewhat as in the case at bar, the condemned land was subject both to annual payments to a water company to defray past expenses for construction of an irrigation system, and to current expenses for maintenance of the system and delivery of the water. After the government condemned the land, the District could no longer collect assessments from the land. To remain in the fiscal position it occupied before the condemnation, it would be necessary to collect higher assessments from the remaining landowners. To prevent this result, this Court ordered the United States to compensate the water company for removing the land from the assessment base.
 
 
 10
 As already mentioned, we applied the Adaman rule in 129.4 Acres I. In both cases, we considered condemnations for a military installation. In Adaman, however, the government had no ongoing need for the water formerly provided by the water company. The Navy here has such a need. Its need springs from the fact that presently a portion of the land serves no immediate military use. It decided to lease that portion for farming. Neither Adaman nor 129.4 Acres I considered the Navy's rights to water under these circumstances. Moreover, neither party has asked us to reconsider Adaman or 129.4 Acres. It follows, therefore, that the Navy must pay the District for the lowered assessment base. The issue before us is whether that payment entitles the Navy to receive water with respect to that portion of the condemned land leased for farming. We agree with the district court that the Navy is entitled to the water.
 
 
 11
 The District argues that the Fifth Amendment bars imposition of a condition on receipt of compensation for condemned land. It cites United States v. Chicago, M., St. P. & P.R.R., 282 U.S. 311, 51 S.Ct. 159, 75 L.Ed. 359 (1931), a case that dealt with the validity of a state law allowing a private party to take property for private use. See id. at 327-29, 51 S.Ct. at 163-64. The District's proposition, whether supported by Chicago, M., St. P. & P.R.R. or not, may be valid; but it does not fit the facts. The District seeks compensation for "losing a customer" while simultaneously refusing to service the Navy, which now partially stands in the shoes of the "lost customer." Put more bluntly, it refuses to give water while demanding that it be paid for water.
 
 
 12
 Nor does the text of the Fifth Amendment support the District. The relevant portion provides: "[N]or shall private property be taken for public use, without just compensation." All agree that the property has been taken; no one argues that it has been taken for private use. Compensation has been paid. It is not made unjust by our vesting in the Navy what the Navy paid for.
 
 
 13
 The Supreme Court has commented frequently that "[t]he guiding principle of just compensation, is that the owner of the condemned property 'must be made whole but is not entitled to more.' " United States v. 564.54 Acres of Land, 441 U.S. 506, 516, 99 S.Ct. 1854, 1860, 60 L.Ed.2d 435 (1979) (quoting Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934)) (emphasis of 564.54 Acres of Land Court omitted); accord United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943) ("[T]he owner is to receive no more than indemnity for his loss...."); Bauman v. Ross, 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270 (1897) ("Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual...."). Compensation would be excessive, not just, were the District permitted to refuse to provide the Navy with the same amounts of water a similarly situated private landowner would have received. The District would receive a "windfall." 564.54 Acres, 441 U.S. at 516, 99 S.Ct. at 1859. The Constitution does not require that. Although we know of no dispositive precedent, we believe our position to be sound. We hold, therefore, that the Constitution does not bar the declaratory judgment's requirement that the District supply water to the Navy as it would supply another landowner in the District similarly situated.
 
 
 14
 3. Statutory Claims.--The District's final objection to the declaratory judgment rests on statutory grounds. The District's argument may be reduced to a simple syllogism: the District can provide water only to land that is subject to the various obligations imposed by federal reclamation law; the condemnation has removed the land from the burden of those obligations; therefore, the District cannot provide water to the land. The statutory basis for this argument is 43 U.S.C. Sec. 492, which provides that "every ... landowner under or upon a reclamation project shall also pay, whenever water service is available for the irrigation of his land, an operation and maintenance charge." The District refers vaguely to ongoing obligations, but when it was pressed at oral argument, it could identify no such obligation other than the payment of assessments. This concern may be disposed of quickly by noting that the Navy occupies with respect to its rights to water a position no better than that of other landowners.
 
 
 15
 The District argues that the Navy's lump sum payment of a condemnation award for reduction in the District's assessment base is not the same thing as annual payment of assessments. We disagree. This argument must fail for the same reason as the constitutional argument. The amount of the award was based on the historical level of the District's expenditures. The District recoups those expenditures through assessments and excess water charges. The only common-sense view of the award is that it represents a lump-sum payment equivalent to the payments a private landowner would have made in the upcoming years. Absent express congressional guidance, we are reluctant to hold that payment of these amounts up front is insufficient to entitle the government to water. We hold that the District must provide the water in accordance with the declaratory judgment.
 
 B. The Navy's Cross-Appeal
 
 16
 The Navy, notwithstanding its support of the declaratory judgment, challenges the district court's determination of the purchase price. The district court based its award on the actual cost of delivering the water; the Navy contends the award should be based solely on the annual assessments charged landowners. The position of the Navy is that, because it has been paying, and plans to continue to pay, for excess water, the district court award requires it, in effect, to pay twice for the excess water.
 
 
 17
 To evaluate this arrangement, we must examine the relation between the District's costs and the revenues it obtains from assessments and excess water charges. The following table provides the record evidence on this point.
 
 
 18
 The district court, as the note in the margin indicates, based the condemnation award upon the overall cost per acre throughout the district.[2] Examination of the figures above reveals that the District has chosen its assessment levels and excess use charges so that each year they roughly equal total expenses. It is impossible to tell from the record whether the District's pricing policy represents a reasonable allocation of the costs to deliveries of excess water. It is clear, however, that the District balances the costs, upon which the district court based the condemnation award, against the revenues from both assessments and excess use charges. In every year, payment of the assessment alone would have been woefully inadequate to recoup costs.
 
 
 19
 We seek to prevent a windfall to either party. The Navy should not receive water for which it has not paid; nor should the District receive a condemnation award based on the costs of delivering water without delivering the water. It is not possible on this record to determine how much it costs the District to deliver the basic amount of water and how much it costs the District to deliver the excess amount of water. What it costs the District as a whole is readily ascertainable. The district court's award, which is based on this aggregate cost, overcompensates the District for the costs of delivering the basic amount of water. Being unable on the basis of this record to determine the actual costs of delivering the basic amount of water, the fair solution, we think, is to affirm the amount of the district court's award--compensating the District for all its costs--and to order the District to provide the Navy with all the water it requires--both the basic amount and the excess--without further payment of excess use charges.
 
 
 20
 This does not constitute a license to the Navy to waste the District's water. We recognize that, because the Navy will not be paying for the water on a unit-by-unit basis, it might use more water than it otherwise would. We conclude that this fear is illusory, because the District's present practices demonstrate its ability to prevent waste of water. The Gila Project Reauthorization Act Sec. 1, ch. 382, 61 Stat. 628, 628 (1947), limits use of the water to "beneficial consumptive use." Accordingly, as the District explained at oral argument, the District can refuse to provide a landowner with even the basic nine acre-feet of water if that landowner cannot make "beneficial consumptive use" of the water. Such a landowner, with respect to the first nine acre-feet of water, is subject to the same incentive to waste water as will be the Navy with respect to excess water. The District prevents such a landowner from wasting irrigable water. We see no reason why it cannot monitor the Navy's use to prevent similar waste.
 
 III.
 CONCLUSION
 
 21
 We affirm the amount of the district court's condemnation award and the district court's declaratory judgment that the District must provide water to the Navy. We also hold that the Navy is entitled to delivery of excess water without payment of excess use charges. To reflect this holding, the amount of the district court's judgment should be reduced to reflect the Navy's payment of excess use charges during the litigation with respect to which the lump-sum award also provides compensation. Because we cannot make this determination from the record, we remand to the district court for the purpose of fixing the net amount of the condemnation award.
 
 
 22
 AFFIRMED IN PART, REMANDED IN PART.
 
 
 23
 KOZINSKI, Circuit Judge, dissenting.
 
 
 24
 The court today achieves rough justice between the parties but in so doing blurs over significant legal distinctions. I am therefore unable to join the court's opinion, which may prove to be a troublesome precedent in future cases where the United States condemns land within local political subdivisions.
 
 
 25
 The court and I part company at its assertion that this is "a dispute over the water rights appurtenant to the fee simple in the land taken by the Navy." At 718. The court treats the water here in question as a common law property right, akin to a riparian right or a right to extract minerals. As I read the record, however, the right to water is quite different in character: it is a benefit of membership in YMID, a political subdivision of the state of Arizona. Indeed, providing water is the only service YMID offers and the only reason for its existence.
 
 
 26
 That the service in question happens to resemble a common law property right[1] ought not distract us from its fundamental character as a political right dependent upon membership in a governmental entity, much like the right to police and fire protection. This distinction was recognized by the Department of the Interior which bluntly rejected the approach adopted by the court today:
 
 
 27
 [T]he United States did not automatically become a member of YMID by virtue of the taking. The YMID is a political subdivision of the state of Arizona, subject to that state's laws regarding organization of the district as well as the setting of boundaries for the district. Short of meeting the requirements of Arizona law applicable to YMID and its members, we do not think the United States completely "stepped into the shoes" of the previous landowners. Thus water deliveries to the Navy cannot be made under YMID's repayment contract as if the United States has become a district member.
 
 
 28
 Letter from Alexander H. Good, Associate Solicitor, Department of the Interior, to Gary Peterson, Assistant Chief, Land Acquisition Section, Department of Justice (April 28, 1983) (emphasis added). As the Executive Branch Department charged with providing YMID water and monitoring its compliance with applicable federal statutes, regulations and contracts, I should think we would give the Interior Department's opinion on this issue significant weight.
 
 
 29
 The court ignores the restriction on YMID's authority to provide water based on its conclusion that there really are no obligations of membership in YMID (other than to pay for the water) and that "the Navy occupies with respect to its rights to water a position no better than that of other landowners." At 719. While this may be true, I am not sure why it matters. Whether the obligations of membership in YMID are few or many, and whether the Navy is being treated fairly or not, the fact remains that the Navy is not a member of YMID. In my view, it simply will not do to say "close enough" and force YMID to deal with the Navy as if it were one of its members.
 
 
 30
 The result the court reaches certainly comports with common sense and fair play: if YMID is to receive "a lump-sum payment equivalent to the payments a private landowner would have made in the upcoming years," this should "entitle the government to water" in the same amount. At 719. However, this approach stands the law of eminent domain on its head. It not only forces YMID to provide water in contravention of its charter, but it also requires the United States to pay for water it has not condemned. The normal rule, of course, is that the condemning authority only pays for that which it has condemned. See Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934); see generally, 3 Nichols On Eminent Domain Secs. 8.6, 8.6 (1985).
 
 
 31
 My approach is different. I would start with the proposition that, by virtue of our earlier ruling, the United States is deemed to have condemned a portion of YMID's assessment base, but nothing more. Since the United States did not condemn the water, and since I can find no independent right for the United States to receive water, I would hold that the United States is not entitled to any water. The question I would then address is the following: What does the United States owe YMID, given that it has reduced its assessment base while at the same time eliminating its obligation to provide water for 77.4 acres? The rule, as the court recognizes, is that "the owner of the condemned property 'must be made whole but is not entitled to more.' " Olson, 292 U.S. at 255, 54 S.Ct. at 709 (emphasis omitted), quoted with approval in United States v. 564.54 Acres of Land, 441 U.S. 506, 516, 99 S.Ct. 1854, 1860, 60 L.Ed.2d 435 (1979). Where the United States only takes part of the property, or where the condemnation confers a benefit to the condemnee, the value left to the condemnee is taken into account in calculating the amount of compensation. United States v. Miller, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943); United States v. Trout, 386 F.2d 216, 221 (5th Cir.1967). In other words, the United States need pay only for the diminution in value to the condemnee. Here the amount the United States has taken from YMID is the narrowing of its assessment base, offset by the value of the water it saves.[2]
 
 
 32
 The approach taken by the majority requires the United States to make a large payment at the outset and obligates YMID to provide water, presumably in perpetuity. Under the approach I suggest, the United States would, in all likelihood, be required to make a much smaller payment, and the land would be cut free of all rights and obligations with respect to YMID. If the United States then wants water, it can sign a contract with YMID or condemn the water. While both results comport with justice, the result adopted by the court forces the United States and YMID into an uneasy, undefined relationship that can only result in friction between them. The majority's approach also sets a precedent that in all likelihood will be troublesome in future cases. I therefore respectfully dissent.
 
 
 
 *
 Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 S.E.R. exhibit "S." The table lists the assessment and revenue figures per acre. The cost and revenue figures represent the per-acre average throughout the District. The record also documents the annual revenue from sixty acres of land within the parcel. For textual illustration of the District's pricing policies, however, we have used the District-wide figures
 Total
 --------
Year Assessment Revenues Costs
---- ---------- -------- ------
1975 $5.00 $3.16 $36.53
1976 25.00 27.13 38.62
1977 27.25 39.28 37.71
1978 27.25 38.91 39.56
1979 30.40 60.72 42.81
1980 33.37 67.64 51.77
1981 38.50 60.71 56.45
 
 
 [2]
 In 1984, the District's costs per acre were $60.93. The district court multiplied that figure by 36 years (the period remaining on the repayment contract) and by 77.3 acres (the number of acres condemned within the District), to reach an award of $169,775.28. This amount is in addition to the $16,147.44 paid to the District for original construction costs. The Navy unsuccessfully argued to the district court that the award should be discounted to present value. It does not press this contention on appeal
 
 
 [1]
 The resemblance between the service provided by YMID and a common law water right is less striking than would at first appear. YMID's water does not flow freely with the forces of nature but is dammed, piped, pumped and metered. It more closely resembles the service provided by a municipal water company
 
 
 [2]
 While the United States has not argued this theory, it has appealed from the district court's judgment on other grounds. See at 717. It is unnecessary to address whether the United States has waived its claim to an offset as a result of its conduct of the litigation. It suffices to note that any waiver by the United States cannot inure to the detriment of YMID, which has consistently and forcefully maintained that it may not be obligated to provide water. If the analysis I have suggested is correct, it would be correct even if the United States were unable to take advantage of its full implications because of a procedural default