**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,**

v.

**10,178 SQUARE FEET OF LAND MORE OR LESS, SITUATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; Morton L. Weitzner, Dorothea M. Weitzner and Isidor S. Weitzner; Morton L. Weitzner, Dorothea M. Weitzner and Isidor S. Weitzner, as Trustees of the Estate of Henry M. Weitzner; Demjo Diner, Inc. and unknown others, Defendants.**

No. 89 Civ. 2173 (RPP).

United States District Court, S.D. New York.

Dec. 20, 1991.

Stroock & Stroock & Lavan by James G. Greilsheimer, Marie V. SantaCroce, New York City, Dennis M. Moore, Nat. R.R. Passenger Corp. (Amtrak), Law Dept., Washington, D.C., for plaintiff.

Peter H. & Hubert J. Brandt by Hubert J. Brandt, Willa I. Lewis, New York City, for Weitzner defendants.

Greco & Gottlieb by Michael J. Greco, New York City, for Demjo Diner, Inc.

## AMENDED REVISED FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT P. PATTERSON, Jr., District Judge.

### PRELIMINARY STATEMENT

The property taken by plaintiff, National Railroad Passenger Corporation ("Amtrak"), in this condemnation action consists of a lot containing 10,178 square feet, a one-story diner building containing many fixtures, a paved lot for parking and a parking attendant's booth. It is located at 365–369 Ninth Avenue on the corner of Ninth Avenue and West 31st Street, New York, New York. It is a corner lot with 74.25 feet accessible frontage on Ninth Avenue and 125 feet accessible frontage on the south side of West 31st Street, west of Ninth Avenue. The lot is zoned M 1–5, which permits development by a commercial or manufacturing building with 50,890 square feet of floor area.

The property is located near the General Post Office Building, Pennsylvania Station and Madison Square Garden. The Javits Convention Center is several blocks to the north and west, near the Hudson River.

The appraisers for Amtrak and the owners each have valued the parcel finding that its highest and best use is not as a parking lot and diner, but for commercial development. As a consequence, from the outset of this proceeding, it was clear that neither appraiser of the fee would place a value on the diner building.

At the time of taking, March 31, 1989, the parcel was leased by its owners, the defendant Trustees of the Estate of Henry M. Weitzner (the "Trustees"), pursuant to a twenty-year renewal lease which was to expire on December 31, 1994. The lease had been assigned to Demjo Diner, Inc. ("Demjo") by the prior lessee who had built a diner on the leased land in 1955 and who had sold it to Demjo on July 1, 1982, pursuant to a separate bill of sale (Demjo Exh. B) for $380,000 covering the diner and all other chattels, fixtures and equipment. In connection with the purchase, Demjo received an assignment of lease (Demjo Exh. B) from Dannan Restaurant & Bar, Inc. ("Dannan") and gave a chattel mortgage (Demjo Exh. C) to Dannan for $300,000. U.C.C.-3s (Demjo Exh. E) were duly filed.

In an earlier opinion dated February 6, 1991, 1991 WL 17852, this Court found that Demjo was entitled to compensation for the value of the diner because, under New York condemnation law, it should be treated as a fixture. Accordingly, Demjo and Amtrak each prepared separate appraisals of the diner building and its contents and offered the testimony of their appraisers on each of those subjects at time of trial.

A trial without a jury took place on May 20, 21, 30, 31 and June 13, 14 and 17, 1991. Post trial briefs were filed by the parties during July 1991.

The parties have stipulated that interest on any judgment shall be paid at the rate of 7.5% per annum.

### FINDINGS OF FACT

*The Fee*

Amtrak's appraiser, Sheldon Gottlieb of Jerome Haims Realty, Inc., valued the subject land at $2,500,000 as of the date of taking, whereas the owner's appraiser, Robert Von Ancken of William A. White/Grubb & Ellis, Inc., valued the property at

$3,360,000. Both appraisers agreed that the highest and best use of the property was commercial use consistent with the parcel's existing M 1–5 zoning, which permits a Floor Area Ratio ("FAR") of 5–0 for a commercial building, or 50,890 FAR square feet of commercial space. Both calculated their appraisal values by utilizing prices obtained per FAR square foot for comparable properties sold prior to the time of taking and made adjustments for location, corner, shape, access, size, zoning, and time of purchase to equate those sales as vacant land with the appraised property at time of taking. Both appraisers used the market approach, basing their conclusions on comparable sales of property in the area. Mr. Gottlieb used five comparable sales, all of which were also included by Mr. Von Ancken in his eleven comparable sales (two of Mr. Von Ancken's sales were combined and utilized by Mr. Gottlieb as an "assemblage" purchase). Mr. Von Ancken used one additional sale for computing "time of purchase" adjustments, but that sale was not included in his sales grid for estimating a value. Mr. Gottlieb did not use five of Mr. Von Ancken's sales deeming them too close to, and too affected by the erection of, the Convention Center. After his adjustments Mr. Von Ancken found that his eleven sales had an average price of $76.70 per FAR square foot and a median price of $61.33 per FAR square foot. He used a value of $66.00 per FAR square foot to reach his valuation of $3,360,000 for the parcel.

Mr. Gottlieb reached his contrary conclusion of $50 per FAR square foot for the parcel based on his five comparable sales by relying principally on two sales, first, a February 1988 sale at 434–440 West 35th Street and Dyer Avenue (Gottlieb Sale 3), and, second, a December 1986 sale at 359–363 Ninth Avenue (Gottlieb Sale 5). Of Mr. Gottlieb's five comparable sales, these two sales have the lowest price FAR and the lowest price after his adjustments. As regards Gottlieb Sale 3, Dyer Avenue is not an ordinary thoroughfare, but a heavily trafficked access road to the Lincoln Tunnel and, therefore, not available for commercial development on that frontage.

Thus, Gottlieb Sale 3 is not a true equivalent corner lot sale and must be adjusted substantially in a comparative analysis. As the Trustees point out, the purchasers did not consider the lot's best use to be commercial since it was in fact developed as a residential site, not as a commercial building. For a residential building the purchasers paid $45.38 per FAR square foot, prior to adjustments for time of purchase, location, etc., due to the residential zoning regulations of 4.8 FAR. Mr. Gottlieb, on the other hand, treated the building's highest and best use as commercial development, using 6 FAR for a price of $36.31 per FAR square foot, prior to adjustments for time of purchase and location, but not for being a non-corner lot without avenue frontage.

Mr. Gottlieb also relied heavily on the sale (Gottlieb Sale 5) of 359–363 Ninth Avenue at West 30th Street, a parcel adjacent to the instant property. This property also suffers from West 30th Street's dedication as an access to Lincoln Tunnel, albeit not to the extent that the Dyer property suffers. Good truck access to any commercial or manufacturing property in this area is important. The West 30th Street frontage of Sale 5 has no sidewalk cuts and is not viable for such usage. Furthermore, although Gottlieb Sale 5 is only 60% of the size of subject property, Mr. Gottlieb made no adjustment for size in arriving at his adjusted unit valuations. The Court accepts Mr. Von Ancken's testimony that adjustments should be made for plottage or size of parcels in the area of Ninth Avenue and 31st Street, New York City. The Trustees point out that the sale occurred in December of 1986 immediately before the federal capital gains tax was raised and that the price received may have been less than full price due to the seller's desire to avoid the increase in capital gains taxes. Mr. Gottlieb's appraisal in relying on these two sales does not make sufficient adjustments for the aforementioned considerations.

Similarly, Mr. Von Ancken, by utilizing more sales closer to the Javits Convention Center than to the subject property, in

spite of his adjustments for location, appears to have been unduly influenced in his appraisal by Javits Convention Center values. Mr. Von Ancken did adjust his price for the appraised property at one-half the rate of price increases that were reflected in the Convention Center area, but this adjustment does not appear to be sufficient. Despite Mr. Von Ancken's adjustments, Mr. Von Ancken's Sales 6 and 11, which result in his highest sales price per FAR square foot and his highest adjusted sales prices for comparable properties, are found too out of line to be utilized in determining the fair market value of the subject property. Accordingly, these two sales price calculations are disregarded. In addition, Mr. Von Ancken's adjustment for location nearer the Convention Center is found to be too small and should be nearer to 10%.

On the other hand, Mr. Von Ancken's manner of adjustment for the escalating prices of real estate in the area in 1986, 1987, 1988 and 1989 appears to have been more thorough than Mr. Gottlieb's. Mr. Von Ancken based his estimates on research into sales and resales of the same parcel in the same general area, whereas Mr. Gottlieb based his estimates on his general knowledge and made no similar detailed analysis. Furthermore, in adjusting for time of purchase, Mr. Gottlieb's appraisal was based on prices at time of closing, whereas Mr. Von Ancken used prices at time of contract which more closely reflect the value a willing buyer will pay and a willing seller will take for a parcel at a particular point in time.[1]

Mr. Von Ancken places heaviest weight on Von Ancken Sales 2, 5 and 7, having adjusted sales prices per FAR square foot respectively of $51.89, $74.64, and $61.33 (Weitzner Def. Exh. C). Mr. Von Ancken also points out that in his judgment Von

Ancken Sale 2 (Gottlieb Sale 5) is undervalued due to the impending increase in capital gains taxes at time of sale and that such an adjustment would bring the value to around $61.97 per FAR square foot.[2] Von Ancken Sales 2, 5 and 7, all sales on main avenues, are found to be most comparable to the subject parcel and the adjustments of Mr. Von Ancken for these parcels are found to be reasonable and appropriate, except that the location adjustment for Von Ancken Sales 5 and 7 should be 10%. The Court finds a fair value per FAR square foot for the subject property is $58.00, for a total value of $2,951,620 as of the time of taking, March 31, 1989.

*The Diner Building and its Trade Fixtures*

The diner and its fixtures were appraised by Charles Land, a member of the American Society of Appraisers with primary experience in fixture appraisal. He valued the diner building as having a replacement value of $342,382 and a sound value of $257,000 after depreciation. Mr. Land testified that his appraisal of the diner building had been made without regard to its "economic depreciation," which he stated due to the termination date of the lease on December 31, 1994 should reduce the value of the property to $116,000.[3] The fixtures were separately appraised by Mr. Land as having replacement value of $331,617, and a sound value of $232,000 after depreciation of 25%.

Demjo's appraiser, Mitchel T. Wolfe, a registered architect with primary experience in design and construction, appraised the diner building as of March 31, 1989 as having a replacement value, including general conditions, general contractor's overhead and profit, architectural fees and fi-

---

1. By using a purchase date midway between the actual purchase dates of August 1987 and August 1988 in Gottlieb Sale 1 (an assemblage comprised of two sales of $69.44 and $99.92 per FAR square foot, respectively), Mr. Gottlieb's appraisal eliminates utilization of the higher rate of escalation of prices prior to the October–November 1987 stock market crash with respect to the August 1987 sale.

2. The square-foot value of Von Ancken Sale 10, Mr. Von Ancken finds, could be adjusted similarly to $62.60.

3. The Trustees have stipulated that if called they would testify they would not have extended the lease to Demjo beyond its termination date.

nancing fees, of $560,150.24 and as having a sound value of $504,135.22 after calculation of depreciation at 10%.

With respect to the fixtures contained in the diner, Mr. Wolfe found their replacement value to be $491,431 and their depreciated or sound value to be $415,123. To this he added costs for sales taxes, general conditions, general contractor's overhead and profit, interior design and financing of $313,189, less 15.5% depreciation of $48,544 for those items, for a total sound value of $679,768 for the fixtures.

*The Diner Building*

Valuing the diner is complicated by the fact that the previous lessee, Dannan, purchased a diner separately, built a cellar foundation and placed the diner on the foundation on the leased land in 1955 (Pl. Exh. 3). On January 1, 1975 Dannan renewed the lease for a term of twenty years, at the end of which the tenant was to surrender the premises to the landlord, as well as surrender "all improvements, replacements, changes and additions thereon, with all equipment in or appurtenant thereto, except movable trade fixtures installed by tenant" (Demjo Exh. D, Art. XI). The lease did not contain a tenant's option to renew for any period of time. Nevertheless, the assignee of the lease, Demjo, undertook a substantial renovation of the diner in mid–1985, adding a decorative Mansard roof, decorative stone veneer, and customized glass doors and windows, as well as new air conditioning, new interior walls, floors, ceiling and other improvements (Demjo Exh. G).

Demjo objects to Mr. Land's appraisal of the diner building, arguing that his appraisal should have included a number of items as part of the building (Demjo Exh. R), which would have increased Mr. Land's appraisal of the replacement value of the diner building from a value of $342,382 to $381,873, and after depreciation of 25%, to $286,405. The Court agrees that the items in Demjo Exh. R, which Mr. Land valued in his appraisal of the diner fixtures as having a total replacement value of $40,775, should be appraised as part of the diner building.

Amtrak objects to Mr. Wolfe's appraisal of the diner fixtures as improperly including items which should be more properly included as Real Estate items (Pl. Exh. 10; Demjo Table (2)). The Court agrees with Amtrak's position and, accordingly, reduces the sound value of the Wolfe trade fixture appraisal by $52,452 and the sound value of the Land trade fixture appraisal by $40,-610. The diner building appraisals are adjusted upwards for those Real Estate items (except item 1, the asphalt paving, $12,000 per Land; $15,313 per Wolfe, which is found non-compensable) by $46,743 for Wolfe's replacement value appraisal and by $45,635 for Land's replacement value appraisal.

Amtrak also suggests that Mr. Wolfe's appraisals should be reduced to eliminate a compounding of "soft costs" pointing out that it would result in a reduction of $49,-385 for Mr. Wolfe's appraisal of the diner building and of $38,021 for his appraisal of the trade fixtures. Mr. Wolfe's compounding does result in too high a total of soft costs for the replacement costs for construction of a one-story building and its trade fixtures, and the non-compounding approach urged by Amtrak is adopted as regards the replacement cost of the construction of the diner building and in part with respect to the valuation of the diner fixtures.

Insofar as the appraisals estimate replacement cost for the items of the construction of the diner, Mr. Wolfe's estimates are generally accepted as more correct than Mr. Land's estimates. Mr. Wolfe was a credible witness and, as an experienced architect, is found to be more competent to make an accurate evaluation of construction costs. Insofar as the appraisals estimate the fixtures' replacement costs and their sound value, Mr. Land's estimates, in general, are accepted as more correct than Mr. Wolfe's estimates. Mr. Land was a credible witness and, as an

experienced fixture appraiser, is found more competent to make appraisals of the going market price of such items. Certain findings of the Court depart from these general rules for which adjustment are made as described below.

The Court's determination of the diner building's value is based on the determination of its value to its owner, Demjo, at the time of taking, *see United States v. 564.54 Acres of Land*, 441 U.S. 506, 510, 99 S.Ct. 1854, 1856–57, 60 L.Ed.2d 435 (1979) (Court seeks "to put the owner of condemned property 'in as good a position pecuniarily as if his property had not been taken' " (quoting *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934))), not taking into consideration the condemnation, but taking into account the terms of the lease and the Court's judgment of "the fair market value," which is the price a " 'willing buyer would pay in cash to a willing seller' at the time of taking." *Id.* (citations omitted); *City of New York v. Sage*, 239 U.S. 57, 61, 36 S.Ct. 25, 26, 60 L.Ed. 143 (1915); *United States v. 1,132.50 Acres of Land*, 441 F.2d 356, 359 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971); *United States v. Certain Property, Borough of Manhattan*, 388 F.2d 596, 600 (2d Cir. 1967).

Demjo purchased the diner and trade fixtures and took an assignment of the lease on July 1, 1982, knowing that the lease contained no provision for its renewal and that the diner and non-movable trade fixtures by the terms of the lease became the property of the lessor upon termination of the lease on December 31, 1994 (Demjo Exh. D). The sales price of $380,000 on July 1, 1982 reflected the value to Demjo of the remaining term of the lease and of the diner building, trade fixtures and other improvements and personal property. The diner building value, as well as the value of the non-removable trade fixtures, was diminished by the term of the lease remaining but the value of the other trade fixtures were not so limited.

■ Similarly, when Demjo made its determination in 1985 to renovate the diner, it did so with full knowledge of the lease terms. The value of these additional improvements to the diner building and additional non-movable trade fixtures to Demjo and, it may fairly be believed, to a prospective purchaser, should be depreciated therefore based on the period of the lease remaining at the time such construction was completed. Depreciation in such a manner will best reflect the loss sustained by Demjo due to the condemnation.

Accordingly, as a base for the Court's findings, the Wolfe appraisal of the replacement costs of the diner building of $327,484.78 (Demjo Exh. J) is utilized. There are added thereto the replacement values of items in Mr. Wolfe's appraisal of trade fixtures, more properly treated as building costs (Pl. Exh. 10), of $98,965, for a total replacement cost for the diner building of $426,449.78. There are deducted therefrom item 1 (Pl. Exh. 10) and item 2.20 (Demjo Exh. J), $15,313 for asphalt and $5,000 for clearing and grubbing, for a total replacement cost of $406,136.78.

Based on Demjo Exh. J, the Court calculates the replacement costs of the old construction at $228,000 and the new construction at $178,136.78. To each replacement cost figure the Court adds non-compounded soft costs. It applies a depreciation figure on the new construction of 37% based on Demjo's decision to build with 117 months remaining on the lease, the condemnation taking place within 42 to 45 months of the estimated date of new construction and the time remaining on the lease at time of taking being 69 months. The foundation and structural work of the old construction calculated at $228,000 the Court depreciates at 80% based on the percentage of lease term remaining since the original construction of the building.

These adjustments result in the following values:

| | Original Constr. | New Constr. |
|---|---|---|
| Replacement costs | $228,000.00 | $178,136.00 |
| Gen'l Conditions | 22,800.00 | 17,813.00 |
| Gen'l Contractor's Overhead | 22,800.00 | 17,813.00 |
| Gen'l Contractor's Profit | 22,800.00 | 17,813.00 |
| Architects' fees | 22,800.00 | 17,813.00 |
| Financing Costs | 8,550.00 | 6,680.10 |
| Court Bond | 2,280.00 | 1,781.00 |
| Filing Fees | 10,000.00 | 10,000.00 |
| Subtotal | $340,030.00 | $267,849.10 |

Depreciation at 80% – $68,006.00    at 37% – $168,744.93

Total    $236,750.93

---

### The Fixture Appraisals

In valuing the diner fixtures, the Court utilizes Mr. Land's base replacement value of $274,630 and his sound values of $190,-632. It does not award compensation for the items in Plaintiff's Exh. 11, which are determined to be personal property and not trade fixtures.[4]

Certain items in Mr. Wolfe's appraisal, particularly items 38, 46, 48, 49, 53, 57, 70, 77, 78, 80, 87, 90, 124 and 131, are based on answers to his telephone inquiries of the manufacturer or based on manufacturer's catalogue prices and are considerably higher than Mr. Land's valuations which are based on comparable but not necessarily identical fixtures taken from Means Building Construction Cost Data or comparable compilations by Marshall & Swift or National for 1989. Amtrak objects to Mr. Wolfe's values for these trade fixtures as not realistic in view of Mr. Land's testimony that in his experience manufacturers' discounts were a distinct probability.

To account for the possibility of such discounts and for the possibility of extra high quality in the exact items for which Mr. Wolfe obtained prices, the Court takes a mid-figure for these items and adds $25,-000 to Mr. Land's appraisal values for fixtures.

The sound value of Mr. Land's appraisal of $190,632 (replacement value is $321,506) for the diner's trade fixtures is thus increased by $25,000 to $215,632. To this are added the soft costs as follows:

| | | |
|---|---|---|
| Mr. Land's Sound Value | | $215,632 |
| 8.25% sales tax on materials only (50% of total) | $ 8,895 (est.) | |
| General Conditions (10%) | 21,563 | |
| Gen'l Contractor's Profit (10%) | 21,563 | |
| Interior designer fee (10%) | 21,563 | |
| Financing 1.5% per month for 1 month | 3,000 | |
| Filing fees, flat fee | 2,500 | |
| | $79,084 | |
| | | 79,084 |
| | | $294,716 |

---

4. Amtrak objects to Mr. Wolfe's inclusion in his appraisal of certain of the diner's fixtures on the grounds that such items are more properly classified as personal property (Pl. Exh. 11), and Demjo has withdrawn items 40, 41, 42, 44, 50, 51, 92, 126 and 127. The Court finds that Amtrak's position on the remaining items is appropriate. Accordingly, it would subtract $59,-314.00 from Mr. Wolfe's estimate of his trade fixture appraisal.

■ Accordingly, the Trustees shall be entitled to a judgment for the taking of the fee of $2,951,620, with interest at 7.5% from March 31, 1989, the date of taking, and Demjo shall be entitled to judgment of $236,751 for the diner building and $294,716 for the diner's trade fixtures, for a total of $531,467, with interest at 7.5% from March 31, 1989, the date of taking.

The Court declines to reconsider its determination contained in its opinion of February 6, 1991 that the diner was a trade fixture under the law of New York and the Second Circuit precedents. The plaintiff had ample opportunity to argue the law and facts at that time and has not complied with Local Rule 3(j). As regards the new authority cited by plaintiff, the fact that the Seventh Circuit in *National Railroad Passenger Corp. v. Faber Enterprises*, 931 F.2d 438 (7th Cir.1991), reached a conclusion in a case involving a tenant occupying a building under a lease containing different terms is not deemed sufficient reason to re-examine this Court's prior opinion.

IT IS SO ORDERED.